IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| B. D. GOLDFIELDS, LTD.,<br>a Ghanaian Corporation,<br>Ex Rel Derivative Action, by<br>Shareholder Paul Oteng, and B. D.<br>GOLDFIELDS, LTD.,<br>a Ghanaian corporation, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | Civil Action No. 1:08-CV-00916-ESH |
| v. | )<br>)<br>) | The Honorable Ellen Segal Huvelle |
| GOLDEN STAR RESOURCES LTD.,<br>a Canadian corporation, and<br>ST. JUDE RESOURCES LTD.,<br>a Canadian corporation, | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## DEFENDANTS' MOTION TO DISMISS (INCLUDING STATEMENT OF POINTS AND AUTHORITIES)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

I.    INTRODUCTION ...................................................................... 1

II.   STATEMENT OF RELEVANT JURISDICTIONAL FACTS ......................................... 3

    A.    Plaintiff B.D. Goldfields is an Alien Corporation ................................... 3

    B.    Defendants Golden Star Resources and St. Jude Resources Are Alien
        Corporations and Have No Contacts with the District of Columbia .................... 3

    C.    Background Concerning Concession Contracts and Settlement of All
        Disputes ........................................................................... 6

        1.    1994 Concession Contract ....................................................... 6

        2.    2005 Concession Contract ....................................................... 6

        3.    2006 Settlement Agreement ...................................................... 7

        4.    Approval of the Settlement Agreement by the Ghanaian Court ....................... 8

III.  LEGAL ARGUMENT ..................................................................... 9

    A.    This Action Should be Dismissed for Lack of Subject Matter Jurisdiction ............ 9

        1.    The Presence of Alien Parties on Both Sides of a Dispute Destroys
            Diversity Jurisdiction under 28 U.S.C. § 1332(a)(2) ............................ 10

        2.    This Case Should Be Dismissed Because the Plaintiff and
            Defendants All Are Foreign Companies .......................................... 11

        3.    The Defendants' Principal Place of Business Does Not Confer
            Subject Matter Jurisdiction ................................................... 12

    B.    This Action Should Be Dismissed for Lack of Personal Jurisdiction .................. 16

        1.    Defendants Are Not Subject to General Jurisdiction ............................. 16

        2.    Defendants are Not Subject to Specific Jurisdiction ............................ 19

        3.    Plaintiff Has Failed to Satisfy Other Due Process Considerations ............... 21

    C.    This Action Should Be Dismissed in Deference to Comity Among Nations ............... 22

TABLE OF CONTENTS
(continued)

Page

1.   The Doctrine of Comity Among Nations ................................................. 22

2.   The Doctrine of Comity Among Nations Demands Dismissal ............... 24

     a.   This Case is Exclusively Ghana-Centered ................................... 25

     b.   The Ghanaian Judiciary Has Already Adjudicated the
          Matter through a Court Order ...................................................... 27

     c.   The Ghanaian Executive Branch Decisions Also Deserve
          Comity ......................................................................................... 28

IV.   CONCLUSION ............................................................................................. 29

TABLE OF AUTHORITIES

Page

Cases

*AGS Int'l Servs. S.A. v. Newmont USA Limited,
    346 F.Supp.2d 64 (D.D.C. 2004) ................................................................. 16, 18

Arista Records, Inc. v. Sakfield Holding Co. S.L.,
    314 F.Supp.2d 27 (D.D.C. 2004) ..................................................................... 16

*Asahi Metal Indus. Co., Ltd. v. Superior Court,
    480 U.S. 102 (1987) ....................................................................... 20, 21, 22

*Bailey v. Grand Trunk Lines New England,
    805 F.2d 1097 (2nd Cir. 1986) ...................................................................... 12

Banco Nacional de Cuba v. Sabbatino,
    376 U.S. 398 (1964) ..................................................................................... 28

*Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985) ..................................................................................... 20

Cameron v. Thornburgh,
    983 F.2d 253 (D.C. Cir. 1993) ....................................................................... 18

*Cellutech, Inc. v. Centennial Cellular Corp.,
    871 F.Supp. 46 (D.D.C. 1994) ....................................................................... 18

Copeland-Jackson v. Oslin,
    2008 WL2211938 (D.D.C., May 29, 2008) .................................................... 21

Corporacion Venezolana de Fomento v. Vintero Sales Corp.,
    629 F.2d 786 (2nd Cir. 1980) ........................................................................ 15

Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC,
    232 F.3d 79 (2nd Cir. 2000) .......................................................................... 15

Diorinou v. Mezitis,
    237 F.3d 133 (2nd Cir. 2001) ........................................................................ 23

*Dooley v. United Technologies Corp.,
    803 F.Supp. 428 (D.D.C. 1992) ..................................................................... 18

*Eisenberg v. Commercial Union Assurance Co.,
    189 F.Supp. 500 (S.D.N.Y. 1960) ................................................................. 12

*Ellicott Machine Corp. v. John Holland Party Ltd.*,
   995 F.2d 474 (4th Cir. 1993) ................................................................ 21

*Emory v. Grenough*,
   3 Dall. 369, 1 L.Ed. 640 (1797) ........................................................... 22

*\*Eze v. Yellow Cab Co. of Alexandria, Va., Inc.*,
   782 F.2d 1064 (D.C. Cir. 1986) ..................................................... 10, 11

*Fandel v. Arabian Am. Oil Co.*,
   345 F.2d 87 (D.C. Cir. 1965) ................................................................ 19

*Formica v. Cascade Candle Co.*,
   125 F.Supp.2d 552 (D.D.C. 2001) ........................................................ 22

*Franceskin v. Credit Suisse*,
   214 F.3d 253 (2nd Cir. 2000) ............................................................... 15

*Gordon and Breach Science Publishers S.A. v. American Institute of Physics*,
   905 F.Supp. 169 (S.D.N.Y. 1995) ........................................................ 24

*\*Gorman v. Ameritrade Holding Corp.*,
   293 F.3d 506 (D.C. Cir. 2002) ....................................................... 16, 20

*Grupo Dataflux v. Atlas Global Group, L.P.*,
   541 U.S. 567 (2004) ............................................................................. 10

*GTE New Media Services, Inc. v. BellSouth Corp.*,
   199 F.3d 1343 (D.C. Cir. 2000) ........................................................... 16

*\*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ....................................................................... 17, 19

*\*Helmer v. Doletskaya*,
   393 F.3d 201 (D.C. Cir. 2004) ............................................................. 19

*Herbert v. National Academy of Sciences*,
   974 F.2d 192 (D.D.C. 1992) .................................................................. 9

*\*Hilton v. Guyot*,
   159 U.S. 113, 16 S.Ct. 139 (1895) ......................................... 22, 23, 28, 29

*\*Idas Resources, N.V. v. Empresa Nacional de Diamantes de Angola E.P.*,
   2006 WL 3060017 (D.D.C., Oct. 26, 2006) ......................................... 11

*In re Arbitration Between Int'l Bechtel Co., Ltd. and*
   *Dep't of Civil Aviation of the Gov't of Dubai*,
   300 F.Supp.2d 112 (D.D.C. 2004) ........................................................ 24

*Int'l Shipping Co. v. Hydra Offshore, Inc.,*
    675 F.Supp. 146 (S.D.N.Y. 1987),
    *aff'd*, 875 F.2d 388 (2nd Cir. 1989) ................................................................. 16

*Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.,*
    875 F.2d 388 (2nd Cir. 1989) ....................................................................... 14, 15

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,*
    536 U.S. 88 (2002) ...................................................................................... 12, 14

*Kowal v. MCI Telecomms. Corp.,*
    16 F.3d 1271 (D.C. Cir. 1994) ........................................................................ 13

*Kramer v. Caribbean Mills, Inc.,*
    394 U.S. 823 (1969)........................................................................................ 10

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,*
    731 F.2d 909 (D.C. Cir. 1984) ....................................................... 23, 24, 28, 29

*Masterson-Cook v. Criss Brothers Iron Works, Inc.,*
    722 F.Supp. 810 (D.D.C. 1989) ...................................................................... 13

*Mattson v. Cuyuna Ore Co.,*
    180 F.Supp. 743 (D. Minn. 1960) ................................................................... 14

*Montalet v. Murray,*
    4 Cranch 46, 8 U.S. 469 (1809) ...................................................................... 10

*Mossman v. Higginson,*
    4 U.S. 12, 1 L.Ed 720 (1800).......................................................................... 10

*Naartex Consulting Corp. v. Watt,*
    722 F.2d 779 (D.C. Cir. 1983) ........................................................................ 18

*Nerco Delamar Co. v. North American Silver Co.,*
    702 F.Supp. 809 (D. Idaho 1989) ................................................................... 14

*Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.,*
    20 F.3d 987 (9th Cir. 1994) ............................................................................ 15

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada,*
    149 F.3d 1086 (10th Cir. 1998) ...................................................................... 20

*Panalpina Welttransport GmbH v. Geosources, Inc.,*
    764 F.2d 352 (5th Cir. 1985) .......................................................................... 14

*Pitney Bowes, Inc. v. United States Postal Service,*
    27 F.Supp.2d 15 (D.D.C. 1998)........................................................................ 9

*Ricart v. Pan American World Airways, Inc.*,
  1990 WL 236080 (D.D.C. 1990) ........................................................................ 24

*Rong v. Liaoning Provincial Gov't*,
  362 F.Supp.2d 83 (D.D.C. 2005) ........................................................................ 9

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999) ........................................................................ 10

*Saadeh v. Farouki*,
  107 F.3d 52 (D.C. Cir. 1997) ........................................................................ 10, 11

*Second Amendment Found. v. U.S. Conference of Mayors*,
  274 F.3d 521 (D.C. Cir. 2001) ........................................................................ 16

*Sequihua v. Texaco, Inc.*,
  847 F.Supp. 61 (S.D. Tex. 1994) ........................................................................ 26

*Sieverding v. American Bar Ass'n*,
  439 F.Supp.2d 111 (D.D.C. 2006) ........................................................................ 21

*Soc'y of Lloyd's v. Siemon-Netto*,
  457 F.3d 94 (D.C. Cir. 2006) ........................................................................ 28

*Société Nationale Industrielle Aérospatiale v. United States District Court*,
  482 U.S. 522 (1987) ........................................................................ 22

*Steamship Co. v. Tugman*,
  106 U.S. 118 (1882) ........................................................................ 14

*Strawbridge v. Curtiss*,
  7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806) ........................................................................ 10

*Tahan v. Hodgson*,
  662 F.2d 862 (D.C. Cir. 1981) ........................................................................ 24

*United States v. Ferrara*,
  54 F.3d 825 (D.C. Cir. 1995) ........................................................................ 16, 19

*United States v. Philip Morris Inc.*,
  116 F.Supp.2d 116 (D.D.C. 2000) ........................................................................ 16

*Universal Licensing Corp. v. Paola del Lungo S.p.A.*,
  293 F.3d 579 (2nd Cir. 2002) ........................................................................ 15

*Von Spee v. Von Spee*,
  514 F.Supp.2d 302 (D. Conn. 2007) ........................................................................ 23

*W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l,*
  493 U.S. 400 (1990)......................................................................... 28

*\*World Wide Minerals Ltd. v. Republic of Kazakhstan,*
  116 F.Supp.2d 98 (D.D.C. 2000),
  *aff'd in part, remanded in part,* 296 F.3d 1154 (D.C. Cir. 2002)......................... 18

*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980)......................................................................... 21

## Statutes and Rules

28 U.S.C. § 1332.............................................................................. 10

28 U.S.C. § 1332(a)(2).................................................................... *passim*

28 U.S.C. § 1332(c)(1)....................................................................... 12

28 U.S.C. § 1391(d) .......................................................................... 11

D.C. Code § 13-423(a)..................................................................... 19, 20

D.C. Code § 13-423(b)..................................................................... 19, 20

D.C. Code 13-334(a) ...................................................................... 16, 19

Fed. R. Civ. P. 11 ........................................................................... 16

Fed. R. Civ. P. 12(b) ......................................................................... 2

Fed. R. Civ. P. 12(b)(1)................................................................. 1, 9, 11

Fed. R. Civ. P. 12(b)(2)................................................................... 1, 16

Fed. R. Civ. P. 12(h)(3).................................................................... 11

## Other Authorities

J. MOORE, MOORE'S FEDERAL PRACTICE § 102.54[1] (3rd Ed. Supp. 2008) .............. 13

*Restatement (Third) of Foreign Relations Law of the United States,*
  § 213 (1986).............................................................................. 14

*Restatement (Third) of Foreign Relations Law of the United States*
  § 403...................................................................................... 24, 26

Restatement (Third) of Foreign Relations Law of the United States,
  § 481...................................................................................... 24

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2), foreign Defendants, Golden Star Resources Ltd. ("Golden Star Resources") and St. Jude Resources Ltd. ("St. Jude Resources") (together, the "Defendants") respectfully request that this Court dismiss this action for (1) lack of subject matter jurisdiction; (2) lack of personal jurisdiction; and (3) international comity among nations.  In support of this Motion, the Defendants state as follows:

## I.    INTRODUCTION

This purported alienage diversity action is an attempt to manufacture a dispute by a dissident shareholder of the Plaintiff, B.D. Goldfields, Ltd. ("B.D. Goldfields" or the "Plaintiff"), concerning the ownership, operation and control of a gold mining Concession (the "Concession") in the Republic of Ghana, West Africa ("Ghana").  Plaintiff B.D. Goldfields is a foreign corporation formed and existing in Ghana.  The two Defendants, Golden Star Resources and St. Jude Resources, are Canadian corporations.  Neither of the Defendants has any connection to the District of Columbia.

Not surprisingly, because this is an action entirely between foreign companies concerning properties in Africa and contracts governed by Ghanaian law, there is absolutely no nexus with this jurisdiction.  Instead, this case implicates Ghanaian natural resources interests which already were litigated and resolved in Ghana several years ago.  All of the issues now raised by Plaintiff B.D. Goldfields in this forum were settled by a Deed of Settlement, dated January 31, 2006, between B.D. Goldfields, St. Jude Resources, the Minerals Commission of Ghana, the Minister of Mines of Ghana and the Attorney General of Ghana.  Furthermore, the Superior Court of Judicature in the Court of Appeals (Civil Division) of Ghana formally approved the Deed of Settlement by order of a three-judge panel.  Thereafter, in accordance with the Deed of Settlement and Court Order, the Government of Ghana issued a new License for the Concession

in favor of one of the Defendants' subsidiaries. The Government of Ghana also retains a ten

percent interest in the Concession through partial ownership of the Ghanaian subsidiary of St.

Jude Resources. Thus, this case is merely an elaborate effort fabricated by a disgruntled

shareholder to overturn the Deed of Settlement, an Order of the Ghanaian Appellate Court and

decisions of the Ghanaian Government in respect to Ghanaian natural resources.

This lawsuit is facially defective and should be dismissed pursuant to Fed. R.

Civ. P. 12(b) and principles of international law for at least three threshold reasons. First, this

Court lacks subject matter jurisdiction under the federal alienage diversity statute, 28 U.S.C.

§ 1332(a)(2), because the dispute is exclusively between foreign parties (*ie*. a Ghanaian Plaintiff

corporation against two Canadian Defendant corporations). Second, this Court lacks personal

jurisdiction over Defendants Golden Star Resources and St. Jude Resources because neither

company has minimum contacts with the District of Columbia. They both lack a traditional

systematic business presence in the District of Columbia (*ie*. no offices, no employees and no

assets in the District of Columbia). Further, the dispute which forms the basis of the Complaint

has no relationship whatsoever to this jurisdiction. Under these circumstances, the Defendants

are not subject to either general or specific personal jurisdiction in the District of Columbia and it

would violate traditional notions of "fair play and substantial justice" for this case to proceed.

Third, this lawsuit should be dismissed in deference to principles of international comity among

nations. Ghana has interests in this matter because the case concerns Ghanaian natural resources

subject to a Concession License issued by the Government of Ghana. Further, the Courts of

Ghana already have decided the matter at issue. Thus, this Court should refrain from

adjudicating this case based upon international comity.

## II.    STATEMENT OF RELEVANT JURISDICTIONAL FACTS

### A.    Plaintiff B.D. Goldfields is an Alien Corporation.

According to the Complaint, the Plaintiff in this action is B.D. Goldfields.[1] Cmplt. at Caption; Preamble ("now comes plaintiff B.D. Goldfields, Ltd. in a direct action"); ¶ 5 ("plaintiff B.D. Goldfields is an alien corporation"); ¶ 47 ("B.D. Goldfields can be styled as a plaintiff"). Plaintiff B.D. Goldfields asserts that it is a "duly organized corporation under the Companies code of the laws of the Republic of Ghana." Cmplt. ¶ 2.

### B.    Defendants Golden Star Resources and St. Jude Resources Are Alien Corporations and Have No Contacts with the District of Columbia.

Defendant Golden Star Resources is a Canadian federally incorporated international gold mining and exploration company established on May 15, 1992 under the Canada Business Corporations Act. *See* Affidavit of Roger Palmer, Vice President Finance of Golden Star Resources Ltd. ¶ 7 (hereinafter, "Palmer Aff."). The Plaintiff admits that Golden Star Resources is a "foreign corporation organized under the laws of Canada." Cmplt. ¶ 9. Golden Star Resources maintains its principal executive office in Littleton, Colorado where some corporate executives are located; however, no direct Golden Star Resources employees are based in Colorado. Palmer Aff. ¶¶ 8 and 11. The registered and records office of Golden Star Resources is in Toronto, Canada. *Id.* ¶ 9. Golden Star Resources also maintains a regional corporate office in Accra, Ghana. *Id.* ¶ 10. Some of Golden Star Resources' corporate executives are based in the Ghana office. *Id.* ¶ 11.

---

[1]    Although the caption and the majority of text of the Complaint indicate that B.D. Goldfields is the *only* Plaintiff, certain passages of the Complaint suggest that Paul Oteng may also be an additional Plaintiff in his capacity as a shareholder, agent or director of B.D. Goldfields. Although these references are unclear and somewhat contradictory, whether or not Paul Oteng is an additional Plaintiff in this case is immaterial to the legal issues presented in this Motion to Dismiss. Thus, the Defendants will refer to B.D. Goldfields as the only Plaintiff in this proceeding.

All of Golden Star Resources' mining operations are conducted outside of the United States. Palmer Aff. ¶¶ 11 and 12. Golden Star Resources, through its subsidiaries, conducts all of its current productive gold mining operations in Ghana. *Id*. ¶ 12. The company operates two active gold mines at its Bogoso/Prestea and Wassa properties in Ghana. *Id*. Day-to-day operational decisions (such as personnel, mine planning, mining, manpower and equipment usage decisions) for the Ghanaian mining operations of Golden Star Resources are made in Ghana, not Colorado. *Id*. During 2007, production totaled approximately 246,278 ounces of gold all of which was mined in Ghana. *Id*. All gold produced by Golden Star Resources, through its subsidiaries, is shipped abroad to a gold refinery in South Africa. *Id*. As of December 2007, Golden Star Resources, through its subsidiaries, had approximately 2,150 employees and contract employees. *Id*. ¶ 11. However, only about 15 employees of a Golden Star Resources' subsidiary are based in Colorado. *Id*.

In addition to its two operating gold mines in Ghana, Golden Star Resources, through its subsidiaries, also has interests in approximately 15 other gold exploration properties which may or may not have development potential. Palmer Aff. ¶ 13. None of these properties are located in the United States. *Id*. Instead, all of Golden Star Resources' gold exploration properties are in West Africa (Ghana, Cote d'Ivoire, Sierra Leone, Burkina Faso, Niger) and, to a lesser extent, Latin America (French Guiana, Brazil and Suriname). *Id*.

The mining Concession described in the Complaint is located in Ghana. Palmer Aff. ¶ 14. There is no active production from the Concession. *Id*. Instead, the property is under development and production currently is expected in late 2008. *Id*. Golden Star Resources owns an interest in the Concession through its wholly-owned subsidiary, St. Jude Resources, which Golden Star Resources acquired in 2005. *Id*. ¶¶ 15 and 16. Currently, the Concession is held

through St. Jude Resources' Ghanaian subsidiary, First Canadian Goldfields Ltd. (Ghana). *Id.*

Defendant St. Jude Resources is a Canadian corporation whose only operations are located in

Ghana. *Id.* The Plaintiff admits that St. Jude Resources[2] is "a prospecting and mining foreign

corporation organized under the laws of Canada." Cmplt. ¶ 8. In accordance with the Ghanaian

Minerals and Mining Act of 2006 and the various agreements and Court Orders which are the

subject of this case, St. Jude Resources owns a 90% interest in the Concession. Palmer Aff. ¶ 17.

The Government of Ghana holds a 10% carried interest in the Concession. *Id.*

Neither of the Defendants has "minimum contacts" with the District of Columbia. The

Defendants have: (1) never had any offices or facilities of any type in the District of Columbia;

(2) never employed any personnel in the District of Columbia; (3) never owned or leased any

real or personal property in the District of Columbia; (4) never paid any taxes in the District of

Columbia; (5) never had any agents or distributors in the District of Columbia; (6) never

received any mail in the District of Columbia; (7) never had any accounts with financial

institutions in the District of Columbia; (8) never conducted mining or exploration operations in

the District of Columbia; (9) never sold mined or refined gold products in the District of

Columbia; (10) never been served with judicial process in the District of Columbia; (11) never

been sued in the District of Columbia prior to this litigation; and (12) never been registered to do

business in the District of Columbia. Palmer Aff. ¶¶ 18-37. Further, the Defendants have not

initiated any communications with Plaintiff B.D. Goldfields in the District of Columbia. *Id.*

¶¶ 33-34.

---

[2]    The Complaint refers to "St. Jude Mineral Resources, Ltd." However, the proper name of St. Jude Resources is "St. Jude Resources Ltd." The Defendants surmise that the Plaintiff made an error in the name of the entity and will respond as if "St. Jude Resources Ltd." were named as a party in this case. St. Jude Resources has also changed the caption in this Motion to Dismiss to accurately reflect its proper corporate name.

C.    **Background Concerning Concession Contracts and Settlement of All Disputes.**

With respect to the dispute alleged in the Complaint, the Plaintiff complains regarding

ownership, operation and control of the Concession in Ghana.  Cmplt. seriatim.  As recited in the

Complaint, these matters are subject to a series of contracts and a full settlement.

1.    **1994 Concession Contract.**

According to the Complaint (¶ 12), the Plaintiff entered into an agreement with St. Jude

Resources relating to the Concession on November 15, 1994 (the "1994 Concession Contract").

A true and correct copy of the 1994 Concession Contract is attached to the Palmer Affidavit as

Exhibit A; Palmer Aff. ¶ 38.  At the time that the Plaintiff and St. Jude Resources entered into

the 1994 Concession Contract, St. Jude Resources listed its address in Canada and had no offices

in the United States.  *Id.* ¶ 39.  The 1994 Concession Contract recites that it is governed by

Ghanaian law.  *Id.* ¶ 40; Exhibit A ¶ 19.  Under the 1994 Concession Contract, the Plaintiff

agreed to transfer an 80% interest in the Concession to St. Jude Resources.  Exhibit A ¶ 2.

2.    **2005 Concession Contract.**

According to the Complaint (¶ 18), the Plaintiff entered into another agreement with St.

Jude Resources relating to the Concession on August 26, 2005 (the "2005 Concession

Contract").  A true and correct copy of the 2005 Concession Contract is attached to the Palmer

Affidavit as Exhibit B.  Palmer Aff. ¶ 41.  At the time that the Plaintiff and St. Jude Resources

entered into the 2005 Concession Contract, St. Jude Resources listed its address in Canada and

had no offices in the United States.  *Id.* ¶ 42.  The 2005 Concession Contract recites that it is

governed by Ghanaian law.  *Id.* ¶ 43; Exhibit B ¶ 10.  The 2005 Concession Contract provided

that all of the Plaintiff's rights in the Concession were transferred to St. Jude Resources.  For

example, the 2005 Concession Contract stated, among other things:

¶ 2.    "… the Assignor [B.D. Goldfields] hereby ASSIGNS unto and to Assignee [St. Jude Resources] all its rights, title and interest in the Prospecting License and in the Concession…."

¶ 4.    "The Assignor [B.D. Goldfields] irrevocably and indefeasibly covenants that this Deed is in full and final satisfaction of all of its rights and interests in and to the Concession, the Prospecting License, under the Original Agreement [1994 Concession Contract]…."

¶ 5.    "The Assignor [B.D. Goldfields] hereby irrevocably and indefeasibly releases the Assignee [St. Jude Resources] forever from all and any claims to any right title or interest in or to the Concession and the Prospecting License and in respect of all its rights under the Original Agreement [1994 Concession Contract]…."

¶ 6.    "The Assignor [B.D. Goldfields] hereby irrevocably and indefeasibly covenants that it shall have no claim to any right title or interest in and to the Concession or the Prospecting License…."

**3.    2006 Settlement Agreement.**

Disputes concerning the ownership and control of the Concession as well as the 1994 Concession Contract and the 2005 Concession Contract were the subject of litigation in Ghana. As part of one of the Ghanaian lawsuits, the Plaintiff and St. Jude Resources entered into a "Deed of Settlement," dated January 31, 2006 (the "2006 Settlement Agreement"). A true and correct copy of the 2006 Settlement Agreement is attached to the Palmer Affidavit as Exhibit C. Palmer Aff. ¶ 44. At the time that the Plaintiff and St. Jude Resources entered into the 2006 Settlement Agreement, St. Jude Resources listed its address in Canada. *Id*. ¶ 45. In addition to the Plaintiff and St. Jude Resources, the other parties to the 2006 Settlement Agreement include the Ghana Minerals Commission, the Minister of Mines of Ghana and the Attorney General of Ghana. *See* Palmer Aff. Exhibit C.

The 2006 Settlement Agreement was a comprehensive and complete settlement of all disputes between the Plaintiff and the Defendants and ratified both the 1994 Concession Contract and the 2005 Concession Contract to clarify that the Plaintiff would retain absolutely no interest in the Concession. For example, the 2006 Settlement Agreement provided, among other things:

¶ (b).   "By a Letter Agreement dated for reference November 15, 1994.... Between St. Jude and BD Goldfields, BD Goldfields agreed to grant St. Jude the right to purchase an 80% right, title and interest in and to the Prospecting License and Concession."

¶ (g).   "By the August 2005 Deed as amended by the Amending Deed, BD Goldfields assigned all its rights, title and interest in and to the Prospecting License, the Concession ... to St. Jude to the extent not transferred pursuant to the Original Agreement."

¶ (i).   "The Attorney General, the Minister and the Commission are each interested in the expeditious development of the Concession and are agreeable to the vesting of the Prospecting License in St. Jude...."

¶ 2.2   "The parties agree that upon execution of this Deed by all of the parties hereto [including B.D. Goldfields] Hwini Butre by its counsel shall take steps to list the matter before the Court of Appeal to have a consent order entered in the following terms.... That having regard to the fact that B.D. Goldfields has assigned all of its rights, interest and claims to the Prospecting License to St. Jude Resources Ltd. and the parties having agreed to terms of settlement by a deed dated 31/01/06 and consenting that... orders be entered by the Court in full and final satisfaction of all claims, appeals and issues between the parties in respect of the Prospecting License...."

¶ 3.   "St. Jude or its nominee shall on the execution of this Deed by all the parties be immediately entitled to work and operate the Concession and to exercise all the rights incident to the holder thereof, free and clear or all liens, claims and encumbrances of any nature whatsoever...."

¶ 4.2.   "B.D. Goldfields covenants that St. Jude or its nominee will have exclusive and quiet possession of the Concession and the Prospecting License and that neither they nor their officers, directors or any other persons claiming through them or in trust for them or as their agents will interfere directly or indirectly with or in any way howsoever disturb St. Jude or its nominee's quiet possession of the Concession and the Prospecting License."

¶ 7.2.   "B.D. Goldfields hereby irrevocably and indefeasibly releases St. Jude... forever from all claims, liabilities and obligations in respect of... the Prospecting License and the Concession.

### 4.   Approval of the Settlement Agreement by the Ghanaian Court.

The Settlement Agreement was approved by the Ghanaian judiciary.  A copy of the

Order, dated February 7, 2006, of the Superior Court of Judicature in the Court of Appeal (Civil

Division) of Ghana is attached to the Palmer Affidavit as Exhibit D; Palmer Aff. ¶ 46.  The

Order was issued by a three judge panel.  Referring to the Settlement Agreement, dated January

31, 2006, the Ghanaian Appellate Court stated: "We make an order giving effect to the terms of settlement contained in the deed of settlement…. The Minister of Mines is hereby ordered on condition that all requisite statutory conditions are met, to issue a new prospecting license in respect of the area covered by the prospecting license to St. Jude Resources Ltd. or its nominee." Palmer Aff. Exhibit D at 1-2. Thus, the Settlement Agreement and Order definitively resolved the claims now asserted by B.D. Goldfields in this case. Thereafter, the Ghanaian Government issued a new License for the Concession in compliance with the Settlement Agreement and Order in the name of St. Jude Resources' nominee, First Canadian Goldfields Ltd. (Ghana). Palmer Aff. ¶ 47. A copy of the License is attached to the Palmer Affidavit as Exhibit E.

### III.    LEGAL ARGUMENT

**A.    This Action Should be Dismissed for Lack of Subject Matter Jurisdiction.[3]**

The Plaintiff alleges subject matter jurisdiction pursuant to the alienage diversity provisions of 28 U.S.C. § 1332(a)(2). Cmplt. ¶¶ 5, 10 and 49. Section 1332(a)(2) states as follows:

> "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between --- (2) citizens of a State and citizens or subjects of a foreign state."

28 U.S.C. § 1332(a)(2). As set forth below, because all of the parties on both sides of this lawsuit are aliens, subject matter jurisdiction does not exist.

---

[3]    Under Fed. R. Civ. P. 12(b)(1), "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." *Rong v. Liaoning Provincial Gov't*, 362 F.Supp.2d 83, 90 (D.D.C. 2005) (*quoting Pitney Bowes, Inc. v. United States Postal Service*, 27 F.Supp.2d 15, 19 (D.D.C. 1998)). "Additionally, in deciding a Rule 12(b)(1) motion, it is well-established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Id.*; *see also Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.D.C. 1992) (same).

**1.    The Presence of Alien Parties on Both Sides of a Dispute Destroys Diversity Jurisdiction under 28 U.S.C. § 1332(a)(2) .**

United States district courts are courts of limited jurisdiction.  For more than two hundred years, the Supreme Court has consistently confirmed the statutory requirement of complete diversity of citizenship under 28 U.S.C. § 1332.  *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).  This general mandate of complete diversity extends also to alienage diversity cases under Section 1332(a)(2).  As a result, under Section 1332(a)(2), United States district courts do not have diversity jurisdiction in lawsuits by foreign plaintiffs against foreign defendants.  *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 569 (2004) ("aliens were on both sides of the case, and the requisite diversity [under Section 1332(a)(2)] was therefore absent"); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 580 n.2 (1999) ("The foreign citizenship of defendant Ruhrgas, a German corporation, and plaintiff Norge, a Norwegian corporation, rendered diversity incomplete."); *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 825 n.2 (1969) ("The District Court would have had no jurisdiction [under Section 1332(a)(2)] of a suit brought by Panama against Caribbean, since both were alien corporations."); *Montalet v. Murray*, 4 Cranch 46, 8 U.S. 469 (1809); *Mossman v. Higginson*, 4 U.S. 12, 14, 1 L.Ed 720 (1800).

According to the Circuit Court of Appeals of the District of Columbia, "[a] diversity suit, in line with the *Strawbridge* rule, may not be maintained in federal court by an alien against a citizen of a state and a citizen of some other foreign country." *Eze v. Yellow Cab Co. of Alexandria, Va., Inc.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986) (dismissing lawsuit in which citizens of Nigeria were plaintiffs and a citizen of Ghana and an American company were defendants); *see also Saadeh v. Farouki*, 107 F.3d 52, 55 (D.C. Cir. 1997) (confirming that alien diversity statute does not confer jurisdiction over lawsuit with aliens on both sides).  In a recent decision

involving an Angolan mining concession, this Court applied the same rule to dismiss a case

prosecuted by Dutch, Dutch Antilles and Canadian companies against Angolan and Dutch

companies. *Idas Resources, N.V. v. Empresa Nacional de Diamantes de Angola E.P.*, 2006 WL

3060017 (D.D.C., Oct. 26, 2006) (Huvelle, J.). This Court succinctly summarized the alienage

diversity requirement: "diversity [under Section 1332(a)(2)] cannot be the basis for a court's

subject matter jurisdiction when there are foreign corporations on both sides." *Id.* at \*11.

2. **This Case Should Be Dismissed Because the Plaintiff and Defendants All Are Foreign Companies.**

The Complaint confirms that the Plaintiff is a Ghanaian corporation. Cmplt. ¶ 2 ("B.D.

Goldfields, Ltd. [is] a duly organized corporation under the Companies code of the laws of the

Republic of Ghana."). Further, the Plaintiff expressly pleads that "[f]or diversity jurisdiction

purposes set forth in 28 U.S.C. § 1332(a)(2), plaintiff B.D. Goldfields is an alien corporation…."

Cmplt. ¶ 5; *see also* ¶ 49 ("plaintiff is an alien corporation").

The Complaint confirms that both of the Defendants are Canadian corporations. Cmplt.

¶ 8 ("St. Jude Mineral Resources, Ltd. [sic] is a prospecting and mining corporation organized

under the laws of Canada"); Cmplt. ¶ 9 ("Golden Star Resources, Ltd. is a prospecting and

mining foreign corporation under the laws of Canada"). In fact, the Plaintiff attempts to plead

venue based upon 28 U.S.C. § 1391(d) which applies only to alien defendants.[4] Cmplt. ¶ 50

("Venue is appropriate in this Court because an alien corporation like defendant Golden Star / St.

Jude can be sued in any district.").

Thus, the Plaintiff's own Complaint dooms alienage diversity jurisdiction, and this Court

should dismiss this case under Fed. R. Civ. P. 12(b)(1) and 12(h)(3) because there are aliens on

both sides of the case. *Eze*, 782 F.2d at 1065; *Saadeh*, 107 F.3d at 55.

---

[4]      28 U.S.C. § 1391(d) states: "An alien may be sued in any district."

3.   **The Defendants' Principal Place of Business Does Not Confer Subject Matter Jurisdiction.**

The Plaintiff expressly concedes throughout the Complaint that both of the Defendants are Canadian corporations and aliens for purposes of federal alienage diversity jurisdiction under Section 1332(a)(2). These concessions are sufficient to warrant dismissal. Notwithstanding, however, the Plaintiff alleges elsewhere that the Defendants' "principal places of business" are located in Colorado and that they should also be considered citizens of Colorado as well as Canadian companies. Cmplt. ¶ 10. The Plaintiff apparently seeks to invoke the dual corporate citizenship provisions of 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and the State where it has its principal place of business") in order to secure subject matter jurisdiction. The Plaintiff's reliance on Section 1332(c)(1) makes no difference to the result.

First, Section 1332(c)(1) may not apply to foreign corporations, because the language of the statute does not refer to "foreign corporations" or "foreign states." Instead, Section 1332(c)(1) refers only to the domestic term "State." As a consequence, many courts have ruled that alien corporations are only citizens of the foreign state of incorporation and Section 1332(c)(1) does not apply in such circumstances. *See Eisenberg v. Commercial Union Assurance Co.*, 189 F.Supp. 500, 502 (S.D.N.Y. 1960). However, there is a split of authority. The Supreme Court recently acknowledged the lack of controlling precedent. *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 98 n.3 (2002).

Second, even if Section 1332(c)(1) applied to the Defendants, the Defendants would be considered citizens of Canada and the worldwide location of their principal place of business (which is Ghana, not Colorado). *See Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1100-01 (2nd Cir. 1986) ("Those courts considering this question [Section 1332(c)(1)]

- 12 -

consistently have held that an alien corporation's *worldwide* principal place of business, and not

its principal place of business within the United States, is controlling[;]" "a corporation may

have only one principal place of business."). In this case, the Plaintiff has asserted only a bare

legal conclusion (devoid of any factual support) that the Defendants' "principal places of

business" are in Colorado.[5] Cmplt. ¶ 49. These assertions are insufficient and are contrary to the

law and facts.

    In this jurisdiction, courts look to the center of corporate activity or the location that

accounts for a majority of company income in determining the "principal place of business" of a

corporation. *Masterson-Cook v. Criss Brothers Iron Works, Inc.*, 722 F.Supp. 810, 812 (D.D.C.

1989). In other words, the focus is on where the bulk of the corporation's physical operations

are located.[6] As set forth in the Palmer Affidavit, the Defendants' locus of operations

unequivocally is in Ghana. The only two operating mines of the Defendants are located in

Ghana. All of the Defendants' revenue is derived exclusively from mining operations in Ghana.

Most of the Defendants' development properties are located in Ghana. The Concession at issue

in this case is located in Ghana. Although the Defendants' corporate headquarters is in

Colorado, it employs less than 1% of its worldwide workforce in Colorado. *See* Palmer Aff.

---

[5]     The Court need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the Complaint. *Kowal v. MCI Telecomms. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

[6]     In the event that no one state is the center of corporate activity, "[f]ederal courts have applied a 'nerve center of operation' test to establish the principal place of business of corporations doing business in multiple states." *Id.*; *see also* J. MOORE, MOORE'S FEDERAL PRACTICE § 102.54[1] (3rd Ed. Supp. 2008) ("as a general principle, courts will look to resolve the question on the basis of the locus of operations first, which is possible only if a corporation is doing business in only a few states, and one state clearly predominates. If … the corporation is doing business over a large geographical area encompassing at least several states more or less equally, then the courts turn their attention to the search for the nerve center.").

¶ 11.  Under these circumstances, Ghana, not Colorado, is the "principal place of business" for both Defendants.[7]

Third, even if the foreign Defendants were deemed to have their "principal places of business" in Colorado, the Plaintiff would still lose the alienage diversity jurisdiction argument because the Defendants would be deemed to be citizens of <u>both</u> Canada and Colorado.  The Defendants' Canadian citizenship is not somehow magically extinguished in place of Colorado citizenship.  This is because "[a] corporation of a foreign State is, for purposes of diversity jurisdiction in the courts of the United States, to be deemed, constructively, a citizen or subject of such state." *JPMorgan Chase*, 536 U.S. at 91 (*quoting Steamship Co. v. Tugman*, 106 U.S. 118, 121 (1882)); *see also Restatement (Third) of Foreign Relations Law of the United States*, § 213 (1986) ("For purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized.").  An alien corporation may add an additional place of citizenship for diversity purposes if its principal place of business is within one of the United States, but it does not lose its foreign citizenship based upon location of incorporation.  *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 391 (2nd Cir. 1989); *Panalpina Welttransport GmbH v. Geosources, Inc.*, 764 F.2d 352, 354 (5th Cir. 1985).  Under such rule, having two citizenships limits (rather than expands) diversity jurisdiction.  *Id.*

---

[7]     Given the unique nature of the domestic and international mining industry, corporate headquarters are often situated in locations remote from mining operations.  "The majority of courts that have reached the issue have held that the principal place of business of a mining corporation is not determined by the 'nerve center' [ie. headquarters] test, but rather by a 'place of operations' test." *Nerco Delamar Co. v. North American Silver Co.*, 702 F.Supp. 809, 811 (D. Idaho 1989).  In other words, "the defendant's principal place of business is where it carries on its mining operations, and where all of its property, facilities and its payrolls and personnel are located, rather than its home office... where its directors and executive officers are located." *Mattson v. Cuyuna Ore Co.*, 180 F.Supp. 743, 745 (D. Minn. 1960) (principal place of business of mining company was Minnesota because that was location of actual mining operations even though corporate headquarters was in Ohio); *Nerco Delamar*, 702 F.Supp. at 811 (court based principal place of business analysis upon the location of "the bulk of ... mining operations, including physical assets and employees" rather than corporate headquarters).  Thus, in the specific context of the mining industry, Golden Star Resources' "principal place of business" should be determined to be in Ghana, not Colorado.

Thus, even if the Defendants were considered citizens of both Canada and Colorado (instead of Canada and Ghana), this Court would still lack alienage diversity jurisdiction under Section 1332(a)(2), because the Plaintiff is an alien and aliens would be present on both sides of the case. The Second Circuit Court of Appeals stated the black letter principle as follows:

> "[E]ven if a corporation organized under the laws of a foreign nation maintains its principal place of business in a State, and is considered a citizen of that State, diversity is nonetheless defeated if another alien party is present on the other side of the litigation."

*Int'l Shipping Co.*, 875 F.2d at 391 (lack of alienage diversity jurisdiction in case brought by Liberian plaintiff against Liberian defendant with alleged principal place of business in New York); *see also Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2nd Cir. 2002) (no alienage diversity jurisdiction in case between plaintiff company incorporated in Korea with principal place of business in New Jersey and Italian defendants); *Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC*, 232 F.3d 79, 82 (2nd Cir. 2000) (case involved Mexican plaintiff against U.A.E. defendant with possible principal place of business in New York; no alienage diversity jurisdiction because aliens on both sides); *Franceskin v. Credit Suisse*, 214 F.3d 253, 258 (2nd Cir. 2000) (no diversity jurisdiction; Argentine plaintiff against Swiss company with principal place of business in New York). *See also Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990-91 (9th Cir. 1994) (real plaintiff was Bermudan corporation with principal place of business in Oregon; no diversity as against foreign corporations); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2nd Cir. 1980) (Venezuelan plaintiff against, among others, Swiss corporation with principal place of business in New York; no diversity because aliens on both sides). The line of authority supporting this proposition (*i.e.* that there is no alienage diversity in a case between an alien plaintiff and a foreign defendant with a principal place of business in the United States) is so

strong that counsel who have argued otherwise have been sanctioned for violation of Fed. R.

Civ. P. 11. *Int'l Shipping Co. v. Hydra Offshore, Inc.*, 675 F.Supp. 146, 154 (S.D.N.Y. 1987),

*aff'd*, 875 F.2d 388 (2nd Cir. 1989).

**B.    This Action Should Be Dismissed for Lack of Personal Jurisdiction.**[8]

Personal jurisdiction over a defendant may be either "general" or "specific." *AGS Int'l*

*Servs. S.A. v. Newmont USA Limited*, 346 F.Supp.2d 64, 74, 77 (D.D.C. 2004).  Both types of

jurisdiction are codified in the District of Columbia and are co-extensive with the due process

clause of the Constitution.  In the present case, because the Defendants have literally no

connection to the District of Columbia (other than federal filings, which are excluded by law

from consideration and unrelated to Plaintiff's grievance), there exists no basis for personal

jurisdiction—either general or specific—over them.

**1.    Defendants Are Not Subject to General Jurisdiction.**

Section 13-334(a) of the District of Columbia Code authorizes the courts in this

jurisdiction to "exercise 'general jurisdiction' over a foreign corporation as to claims not arising

from the corporation's conduct in the District, if the corporation is 'doing business' in the

District." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002).  The

"doing business" test of this statutory provision is coextensive with the due process requirements

of the Constitution and "requires an examination of the frequency and volume of the

[defendants'] transactions with District [of Columbia] residents." *Id*. at 513.  Under the due

---

[8]      On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff has the burden of establishing a prima facie case of personal jurisdiction. *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).  The court need not treat all of the plaintiff's allegations as true. *United States v. Philip Morris Inc.*, 116 F.Supp.2d 116, 120 n.4 (D.D.C. 2000); *GTE New Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000) (stating that courts should not accept bare allegations and conclusory statements).  Moreover, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F.Supp.2d 27, 30 (D.D.C. 2004).  In a purported diversity action such as this, the court's personal jurisdiction over nonresident defendants is determined by state law, here the law of the District of Columbia. *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).

process clause, general jurisdiction is established when the defendant has "continuous and systematic" general business contacts with the forum state, so that the defendant could reasonably anticipate being haled into court in this forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).

The Complaint in the present case alleges that "[a]t all relevant times for this Complaint, Golden Star conducted transactional and operational mining business in the Republic of Ghana, and conducted business also in the United States. This complaint pleads causes of action arising out of business conducted in the United States." Cmplt. ¶ 9(a). However, the Complaint does not describe the nature of the business conducted in the United States, and there are no allegations describing the frequency and volume of the Defendants' contacts with District of Columbia residents. This is not surprising, because the Defendants have never: (1) had any offices or facilities of any type in the District of Columbia; (2) employed any personnel in the District of Columbia; (3) owned or leased any real or personal property in the District of Columbia; (4) paid any taxes in the District of Columbia; (5) had any agents or distributors in the District of Columbia; (6) received any mail in the District of Columbia; (7) had any accounts with financial institutions in the District of Columbia; (8) conducted mining or exploration operations in the District of Columbia; (9) sold mined or refined gold products in the District of Columbia; (10) been served with judicial process in the District of Columbia; (11) been sued in the District of Columbia prior to this litigation; or (12) been registered to do business in the District of Columbia. Palmer Aff. ¶¶ 18-37.

The *only* District of Columbia connection asserted by the Complaint is that the Defendants made securities filings with the United States Securities and Exchange Commission. *See* Cmplt. ¶ 11 ("At all relevant times, both St. Jude and Golden Star were publicly traded stock

corporations ... filing required quarterly and annual financial reports with the Securities and

Exchange Commission EDGAR system in Alexandria, Virginia and Washington, D.C.").[9] This

connection is insufficient to confer general jurisdiction on this Court. The "government contacts

exception" precludes the assertion of personal jurisdiction over a non-resident whose only

contacts with the District of Columbia are for purposes of dealing with a federal agency or

Congress. *Dooley v. United Technologies Corp.*, 803 F.Supp. 428, 434 (D.D.C. 1992); *see also*

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786-87 (D.C. Cir. 1983). This Court has

further held that "[t]he fact that ... the defendants made filings with the FCC and the SEC in the

District of Columbia does not, standing alone, provide jurisdiction here." *Cellutech, Inc. v.

Centennial Cellular Corp.*, 871 F.Supp. 46, 50 (D.D.C. 1994). The government contacts

exception therefore excludes from consideration any SEC filings submitted by the Defendants.

*World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F.Supp.2d 98, 105 (D.D.C. 2000),

*aff'd in part*, *remanded in part*, 296 F.3d 1154 (D.C. Cir. 2002) (doctrine excludes from

jurisdictional consideration the defendant's contacts with federal instrumentalities); *see also*

*Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993) ("Courts in this circuit must

examine challenges to personal jurisdiction and venue carefully to guard against the danger that a

plaintiff might manufacture venue in the District of Columbia.").

The Complaint does not establish that the Defendants have had contacts with the District

of Columbia "so continuous and systematic that [they] could foresee being haled into court in the

District of Columbia," *AGS Int'l Servs.* 346 F.Supp.2d at 74, and the Palmer Affidavit

conclusively rebuts that proposition. Accordingly, neither Golden Star Resources nor St. Jude

Resources are subject to general jurisdiction in the District of Columbia. *See Helicopteros*,

---

[9]    Defendants treat this allegation as true for purposes of this motion only. Defendants note that the allegation
regarding St. Jude Resources is incorrect.

466 U.S. at 415-16; *see also Fandel v. Arabian Am. Oil Co.*, 345 F.2d 87, 89 (D.C. Cir. 1965) (defendants who were in the business of selling oil and gas in the Middle East and who maintained an office in District of Columbia were not "doing business" in the District for purposes of § 13-334(a)).

### 2.     **Defendants are Not Subject to Specific Jurisdiction.**

Authorization for exercising specific jurisdiction over a defendant in the District of Columbia is found at D.C. Code § 13-423(a). The statute provides, *inter alia*, that personal jurisdiction exists over a person acting directly or by an agent for a claim for relief arising from the person's:

> "(1) transacting any business in the District of Columbia;
> (2) contracting to supply services in the District of Columbia;
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia[.]"

D.C. Code § 13-423(a). Subsection (b) qualifies the reach of the statute by requiring that "[w]hen jurisdiction over a person is based solely on this section, only a claim for relief arising from acts enumerated in this section may be asserted against him." D.C. Code § 13-423(b). The District's long-arm statute is "given an expansive interpretation that is coextensive with the due process clause." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (citations and quotation marks omitted). Therefore, the "statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry here." *Ferrara*, 54 F.3d at 828.

Consistent with the due process clause, a court may properly exercise specific personal jurisdiction "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted). "Purposeful availment requires actions by the defendant which 'create a substantial connection with the forum state.'" *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1092 (10th Cir. 1998) (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 109 (1987)).

In the present case, Defendants have not "purposefully directed" their activities toward the District of Columbia.  Neither Golden Star Resources nor St. Jude Resources has derived any income from transactions in the District of Columbia or entered into contracts with residents of the District of Columbia.  Palmer Aff. ¶¶ 35-36.  And neither Defendant has initiated contact with B.D. Goldfields or Paul Oteng in the District of Columbia.  *Id*. ¶¶ 33 and 34.

Indeed, the Complaint confirms that the focal point of this dispute is Ghana, not the District of Columbia.  The Plaintiff is a corporation formed under the laws of the Republic of Ghana; Cmplt. ¶ 2; the mining concession described in the Complaint is located in Ghana; ¶ 6; the 1994 Concession Contract and the 2005 Concession Contract between B.D. Goldfields and St. Jude Resources concern the mining Concession in Ghana; ¶¶ 12 and 18; and the claims for relief alleged in the Complaint ask the Court to take action with respect those Ghanaian contracts and mining properties.  ¶¶ 54-61.  No allegation in the Complaint even suggests that Defendants availed themselves of the privilege of acting in the District of Columbia or that their activities had any connection to the District.  Further, because the Defendants have not undertaken activities in the District of Columbia, the injuries alleged in the Complaint could not have arisen out of the Defendants' forum-related activities.

Accordingly, the Plaintiff's allegations do not satisfy the explicit terms of the long-arm statute or the constitutional requirements for specific jurisdiction.  *See* D.C. Code § 13-423(a)-(b); *see also Gorman*, 293 F.3d at 509 ("because Gorman's breach of contract claim against

Ameritrade does not arise out of any business transacted between the parties in the District, this font of jurisdiction is unavailable"); *Sieverding v. American Bar Ass'n*, 439 F.Supp.2d 111, 120 (D.D.C. 2006) ("Because the plaintiffs' claims have nothing to do with the defendants' conduct in the District of Columbia, this court cannot exercise personal jurisdiction over the defendants."); *Copeland-Jackson v. Oslin*, 2008 WL2211938 (D.D.C., May 29, 2008) (Huvelle, J.) (dismissing complaint because "Plaintiff has … failed to make any showing that defendants purposely availed themselves of the privilege of doing business in the District, such that the exercise of jurisdiction over them would not offend due process.").

### 3.    Plaintiff Has Failed to Satisfy Other Due Process Considerations.

In addition to the requirements set forth above, the United States Supreme Court has developed a series of common-sense factors which should be considered in determining whether the exercise of personal jurisdiction over a non-resident defendant comports with "fair play and substantial justice."

> "A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interests of the several States in furthering fundamental fairness.'"

*Asahi*, 480 U.S. at 113 (*quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). These factors apply with particular force in actions against foreign national defendants. *Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 479 (4th Cir. 1993).

Here, the Defendants do not maintain any offices, employees or other agents in the District of Columbia. Palmer Aff. ¶¶ 18-33. They maintain corporate offices in Colorado and regional corporate offices in Ghana. Palmer Aff. ¶¶ 8-10 and 16. Therefore, the burden on the

Defendants to defend this dispute in federal district court in the District of Columbia would be significant.

Further, neither of the Defendants are residents of the District of Columbia and neither company has any substantial connection to the forum. Under these circumstances, the District of Columbia's "legitimate interests in the dispute [is] considerably diminished." *Formica v. Cascade Candle Co.*, 125 F.Supp.2d 552, 556 (D.D.C. 2001) (Huvelle, J.) (quoting *Asahi*, 480 U.S. at 114).

Finally, the Plaintiff's interest in obtaining relief in this forum is nonexistent. Neither B.D. Goldfields nor the shareholder directing this purported derivative action, Paul Oteng, is a resident of the District of Columbia. Cmplt. ¶¶ 1-2. Given the lack of contacts between the Defendants and the District of Columbia, and the lack of any alleged injury to the Plaintiff in the District of Columbia, the Plaintiff has no legitimate interest in obtaining relief in this jurisdiction.

**C.    This Action Should Be Dismissed in Deference to Comity Among Nations.**

**1.    The Doctrine of Comity Among Nations.**

Comity among nations refers to "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société Nationale Industrielle Aérospatiale v. United States District Court*, 482 U.S. 522, 543 n.27 (1987). The doctrine of "international comity" or "comity among nations" has been recognized in United States jurisprudence for more than two hundred years. *Emory v. Grenough*, 3 Dall. 369, 370, n., 1 L.Ed. 640 (1797). In *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 143 (1895), the Supreme Court explained:

> "The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations'... 'Comity,' in the legal

> sense, is neither a matter of absolute obligation, on the one hand,
> nor of mere courtesy and good will, upon the other. But it is the
> recognition which one nation allows within its territory to the
> legislative, executive, or judicial acts of another nation, having due
> regard both to international duty and convenience, and to the rights
> of its own citizens, or of other persons who are under the
> protection of its laws."

*Id.* Put another way, international comity is premised upon three core principles: "the proper respect for litigation in and the courts of a sovereign nation, fairness to the litigants, and judicial efficiency." *Von Spee v. Von Spee*, 514 F.Supp.2d 302, 318 (D. Conn. 2007) (dismissing suit on the basis of international comity because "this Court's decision to exercise its jurisdiction would reflect disrespect for the German court's decisions and rulings [on the same issues]."). Comity "serves our international system like the mortar which cements together a brick house." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984).

United States federal courts typically defer to foreign proceedings or adjudications as a matter of comity in at least three contexts:

> "In one context, the domestic court considers whether to proceed
> with litigation properly within its jurisdiction because of the
> pendency or availability of litigation in a foreign forum. When
> domestic courts in that context say that they are deferring to
> foreign tribunals as a matter of "comity", they are invoking a
> doctrine akin to *forum non conveniens*.... In a second context, a
> domestic court considers whether to enforce a foreign judgment....
> In the third context... a domestic court considers whether to accept
> the adjudication of a foreign tribunal on a cause of action or a
> particular issue...."

*Diorinou v. Mezitis*, 237 F.3d 133, 139 (2nd Cir. 2001).

The Circuit Court of Appeals for the District of Columbia has repeatedly confirmed the general rule that comity among nations deference ordinarily should apply to foreign judgments:

> "[T]he central precept of comity teaches that, when possible, the
> decisions of foreign tribunals should be given effect in domestic
> courts, since recognition fosters international cooperation and
> encourages reciprocity, thereby promoting predictability and

> stability through satisfaction of mutual expectations. The interests
> of both forums are advanced – the foreign court because its laws
> and policies have been vindicated; the domestic country because
> international cooperation and ties have been strengthened. The
> rule of law is also encouraged, which benefits all nations."

*Laker Airways*, 731 F.2d at 937; *see also Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981)

(judgments of foreign courts are generally enforced in the courts of the United States); *Ricart v.*

*Pan American World Airways, Inc.*, 1990 WL 236080 at *1 (D.D.C. 1990) (same).

As applied in the context of prior foreign adjudications, comity is the international

functional equivalent of the *res judicata* or claim preclusion doctrines. *See In re Arbitration*

*Between Int'l Bechtel Co., Ltd. and Dep't of Civil Aviation of the Gov't of Dubai*, 300 F.Supp.2d

112, 117 (D.D.C. 2004) ("The theory often used to account for the *res judicata* effects of foreign

judgments is that of comity, which is the 'recognition which one nation allows within its territory

of the legislative, executive or judicial acts of another nation.'"); *see also Gordon and Breach*

*Science Publishers S.A. v. American Institute of Physics*, 905 F.Supp. 169, 178-79 (S.D.N.Y.

1995) ("It is well-established that United States courts are not *obliged* to recognize judgments

rendered by a foreign state, but may choose to give *res judicata* effect to foreign judgments on

the basis of comity.").[10]

## 2.     The Doctrine of Comity Among Nations Demands Dismissal.

This dispute should be dismissed for international comity because this case: (1) is

exclusively Ghana-centered; (2) the Ghanaian Judiciary Branch has already issued a final Order

approving the Settlement Agreement and resolving the claims asserted in this case; and (3) the

Ghanaian Executive Branch (through the Ghanaian Ministry of Mines) has also endorsed the

---

[10]     Comity principles are a bedrock of international law and have been codified in the *Restatement (Third) of Foreign Relations Law of the United States* §§ 403 and 481. "When it would not be unreasonable for each of two states to exercise jurisdiction over a person or activity... each state has an obligation to evaluate its own as well as the other state's interest in exercising jurisdiction, in light of all the relevant factors...; a state should defer to the

Settlement Agreement and taken governmental action to issue a License for the Concession to Defendant St. Jude Resources' nominee.

### a.    This Case is Exclusively Ghana-Centered.

The allegations in the Complaint demonstrate that this case is entirely Ghana-centered, thus supporting deference to the Ghanaian judicial system. Plaintiff B.D. Goldfields is a Ghanaian corporation that operates and maintains its offices in Accra, Ghana. Cmplt. ¶¶ 2 and 6. The principal shareholders of Plaintiff are Ghanaian, Dutch and Cameroonian (albeit that the Complaint asserts that Paul Oteng is a dual citizen of the United States and Ghana). The Defendants' only mining operations and principal places of business are in Ghana. *Id.* ¶ 6. The Concession at issue in this case is for a Ghanaian gold mine. *Id.* Plaintiff claims that it obtained the Ghanaian gold mining Concession from the Government of the Republic of Ghana and that the Concession "complied with Ghanaian law." *Id.* ¶¶ 6 and 7.

Plaintiff describes a series of contracts relating to the Concession. For example, Plaintiff describes the 1994 Concession Contract which transferred an 80% interest in the Concession from Plaintiff to St. Jude Resources. Cmplt. ¶ 12-14. The 1994 Concession Contract was between a Canadian company and a Ghanaian company for transfer of Ghanaian property interests pursuant to Ghanaian law. Palmer Aff. Exhibit A. Similarly, Plaintiff references the 2005 Concession Contract which is also between a Canadian company and a Ghanaian company for transfer of Ghanaian property interests pursuant to Ghanaian law. *Id.* Exhibit B.

The Complaint describes a long and tortured sequence of litigation in the Ghanaian judicial system (both at the trial and appellate levels) from 1994 to 2005 involving the Concession as well as another Ghanaian company: Hwini-Butre Minerals Ltd. Cmplt. ¶ 14-18.

---

other state if that state's interest is clearly greater." *Id.* at § 403(3). If a judgment has been entered in the foreign nation, such judgment presumptively is entitled to recognition in courts in the United States. *Id.* at § 481.

The Plaintiff asserts that there was even more litigation in the Ghanaian courts starting in 2005 brought by shareholders of the Plaintiff. *Id.* ¶ 21. Apparently, that litigation may have been based in part upon a meeting of shareholders of the Plaintiff in Ghana. *Id.* ¶¶ 20 and 21. The Plaintiff attached an Order of one superceded Ghanaian court order to the Complaint. Cmplt. Exhibit A. The Plaintiff invokes "the common and statutory law of Ghana." *Id.* ¶ 26. Plaintiff acknowledges the Ghanaian focus and Ghanaian interests when it argues that the Defendants are engaged in a "an egregious exploitation of mineral assets of the Republic of Ghana." Cmplt. ¶ 56.

Through this case, the Plaintiff is attempting to void the 1994 Concession Contract and the 2005 Concession Contract and reopen issues concerning ownership of the Ghanaian Concession. Cmplt. ¶¶ 37 and 55. However, as set forth below, the Plaintiff has already settled such matters in Ghana through the Settlement Agreement. Palmer Aff. Exhibit C. Further, the Settlement Agreement has been made an Order of a Ghanaian Court and approved by the Ghanaian Executive Branch. Palmer Aff. Exhibits D and E.

This case calls out for application of international comity given the exclusively Ghanaian focus. *See Sequihua v. Texaco, Inc.*, 847 F.Supp. 61 (S.D. Tex. 1994); *Restatement (Third) of Foreign Relations Law of the United States* § 403. There is no connection to the District of Columbia. However, important Ghanaian interests are directly implicated. The Ghanaian legal system and Ghanaian Executive Branch should determine ownership and rights in Ghanaian mineral concessions, not a court in the United States. Thus, this Court should defer to the greater interests of Ghana.[11]

---

[11] Although this Court should dismiss this case under general principles of international comity, Defendants reserve their right to pursue *forum non conveniens* dismissal if necessary at a later stage.

**b.    The Ghanaian Judiciary Has Already Adjudicated the Matter through a Court Order.**

Plaintiff acknowledges that the parties in interest have already entered into a Settlement Agreement. Cmplt. ¶ 27; Palmer Aff. Exhibit C. The parties to the Settlement Agreement included Plaintiff B.D. Goldfield, Defendant St. Jude Resources, the Minerals Commission of Ghana, the Ghanaian Minister of Mines and the Ghanaian Attorney General. Palmer Aff. Exhibit C. As set forth in more detail above in Section II.C.3, the Settlement Agreement was a comprehensive and complete settlement of all disputes between Plaintiff and Defendant St. Jude Resources and resolved all issues concerning ownership of the Concession. The Settlement Agreement ratified the 1994 Concession Agreement and 2005 Concession Agreement. Palmer Aff. Exhibit C ¶¶ (b) and (g). Furthermore, Plaintiff agreed that Defendant St. Jude Resources would have exclusive and quite possession of the Concession. Id. ¶¶ 3 and 4.2. Plaintiff expressly released the same type of claims that are now being asserted in this case. Id. ¶ 7.2.[12]

Importantly for purposes of international comity, the Settlement Agreement was presented to the Ghanaian judiciary in the context of pending adversarial litigation. At the request of the parties, a three-judge panel of the Superior Court of Judicature in the Court of Appeal (Civil Division) of Ghana entered an Order approving the Settlement Agreement. Palmer Aff. Exhibit D. This Order specifically referred to the Settlement Agreement and stated: "We make an order giving effect to the terms of the settlement contained in the deed of settlement." Id. The appellate Court further directed the Ghanaian Minister of Mines to issue a new prospecting license to St. Jude Resources. Id.

---

[12]    The Settlement Agreement provides the Defendants with other affirmative defenses to this case including release, waiver and estoppel. The Defendants reserve such defenses. However, this case should be dismissed prior to the need to address such additional defenses.

The Order represents a final and conclusive action of the Ghanaian judiciary entitled to deference under principles of international comity. *Hilton*, 159 U.S. 113; *Laker Airways*, 731 F.2d at 937. To allow this action to proceed would be an affront to the Ghanaian courts.

### c. The Ghanaian Executive Branch Decisions Also Deserve Comity.

The Ghanaian Executive Branch was a party to the Settlement Agreement through both the Ghanaian Ministry of Mines and the Attorney General of Ghana. Palmer Aff. Exhibit C. The Settlement Agreement expressly states that "[t]he Attorney General, the Minister and the Commission are each interested in the expeditious development of the Concession and are agreeable to the vesting of the Prospecting License in St. Jude…." *Id.* ¶ 2.2. The Ghanaian Executive Branch was also party to the case through which the Settlement Agreement was approved by the Ghanaian Court. Palmer Aff. Exhibit D.

In compliance with the Settlement Agreement and the Ghanaian Court Order, the Ghanaian Ministry of Mines subsequently issued a new License for the Concession to St. Jude Resources. Palmer Aff. ¶ 47; Exhibit E. Thereafter, the Defendants have proceeded with the development of the Concession in Ghana in order to achieve production as soon as practicable. *Id.* The Settlement Agreement and subsequent actions of the Ghanaian Executive Branch represent official governmental action of a foreign sovereign entitled to deference.[13] In light of the Ghanaian Government's policy decision and actions to facilitate rapid development of the Concession, Plaintiff should not be permitted to reopen already-resolved issues and cause additional years of uncertainty and delay in gold production to the detriment of the people of

---

[13]    Because the nature of the Plaintiff's claims is a back-door attack on the legality of Ghanaian governmental conduct (including the Order issued by the Ghanaian Court and the License issued by the Ghanaian Ministry of Mines) and interferes with the sovereign policy of Ghana to expeditiously develop its mineral assets, further adjudication of this case also is barred by the Act of State doctrine. *W.S. Kirkpatrick & Co. v. Env't'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 102-03 (D.C. Cir. 2006). The Defendants reserve such Act of State defense to further prosecution of this case.

Ghana. Instead, the actions of the Government of Ghana should be respected. *Hilton*, 159 U.S.

113; *Laker Airways*, 731 F.2d at 937.

## IV. CONCLUSION

For the reasons set forth above, this case should be dismissed for lack of subject matter

jurisdiction or lack of personal jurisdiction. Alternatively, this action should be dismissed under

the doctrine of comity among nations.

Dated:  July 7, 2008.                        Respectfully submitted,

/s/ Brian P. Perryman
Stephen J. Jorden (Bar No. 441138)
Brian P. Perryman (Bar No. 491034)
JORDEN BURT LLP
Jefferson Square, Suite 400 East
1025 Thomas Jefferson Street, NW
Washington, DC 20007-5208
Telephone:  202.965.8100
Facsimile:  202.965.8104


/s/ Thomas P. Johnson
Thomas P. Johnson
Tom McNamara
Rudy E. Verner
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO  80202
Telephone: (303) 892-9400
Facsimile: (303) 893-1379

ATTORNEYS FOR DEFENDANTS
GOLDEN STAR RESOURCES LTD.
AND ST. JUDE RESOURCES LTD.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| B. D. GOLDFIELDS, LTD., | ) | |
| a Ghanaian Corporation, | ) | |
| Ex Rel Derivative Action, by | ) | |
| Shareholder Paul Oteng, and B. D. | ) | |
| GOLDFIELDS, LTD., | ) | |
| a Ghanaian corporation | ) | Civil Action No. 1:08-CV-00916-ESH |
| | ) | |
| Plaintiff, | ) | The Honorable Ellen Segal Huvelle |
| | ) | |
| v. | ) | |
| | ) | |
| GOLDEN STAR RESOURCES LTD., | ) | |
| a Canadian corporation, and | ) | |
| ST. JUDE RESOURCES LTD., | ) | |
| a Canadian corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**AFFIDAVIT OF ROGER PALMER**

---

I, ROGER PALMER, depose and state under oath as follows:

1.    I am Vice President Finance and Interim Chief Financial Officer of Golden Star Resources Ltd. ("Golden Star Resources"). I have held the position of Vice President Finance of Golden Star Resources since approximately May 2005 and the position of Interim Chief Financial Officer of Golden Star Resources since January 2008, and previously was Controller of Golden Star Resources from July 2000 to December 2007.

2.    My current business address is: 10901 West Toller Drive, Suite 300, Littleton, Colorado 80127-6312.

3.    I have personal knowledge of the facts stated in this Affidavit.

4.    With respect to Golden Star Resources, I have worked at the company since July 2000 and have personal knowledge regarding the business and operations of Golden Star Resources for the time period from July 2000 through the present based upon my day-to-day work as a corporate executive of the company. With respect to statements in this Affidavit concerning Golden Star Resources' business and operations prior to July 2000, I have made diligent and reasonable inquiry and considered relevant corporate records and practices.

Accordingly, for time periods prior to July 2000, my statements regarding Golden Star Resources are based upon such reasonable inquiry.

5.    With respect to St. Jude Resources Ltd. ("St. Jude Resources"), Golden Star Resources acquired St. Jude Resources in December 2005 and St. Jude Resources is currently a wholly-owned subsidiary of Golden Star Resources. For the time period from the acquisition of St. Jude Resources in December 2005 to the present, I have personal knowledge of St. Jude Resources based upon my day-to-day work as a corporate executive of Golden Star Resources. With respect to time periods prior to December 2005, I have made diligent and reasonable inquiry and considered relevant corporate records and practices. I have also obtained information from prior management of St. Jude Resources. Accordingly, for time periods prior to December 2005, my statements regarding St. Jude Resources are based upon such reasonable inquiry.

6.    This Affidavit is made in support of the Motion to Dismiss for Lack of Subject Matter Jurisdiction, Lack of Personal Jurisdiction and International Comity Among Nations, filed by Golden Star Resources and St. Jude Resources.

7.    Golden Star Resources is a Canadian federally incorporated international gold mining and exploration company, established on May 15, 1992 under the Canada Business Corporations Act.

8.    Golden Star Resources maintains its executive and administrative offices in Littleton, Colorado.

9.    The registered and records office of Golden Star Resources is in Toronto, Canada.

10.    Golden Star Resources also maintains a regional corporate office in Accra, Ghana.

11.    As of December 2007, Golden Star Resources, through its subsidiaries, had approximately 2,150 employees and contract employees, virtually all of which are employed in Ghana. Some of the company's corporate executives are based out of its Littleton, Colorado office. Other corporate executives are based at the corporate offices in Accra, Ghana. Golden Star Resources does not have any employees in Colorado. However, approximately 15 people from a Golden Star Resources subsidiary are based in the Colorado office.

12.    Golden Star Resources, through its subsidiaries, conducts all of its current productive gold mining operations in Ghana. The company operates two active gold mines on its Bogoso/Prestea and Wassa properties in Ghana. During 2007, production from these mines totaled approximately 246,278 ounces of gold, all of which was shipped abroad to a gold refinery in South Africa. All of the operating revenue of Golden Star Resources and its subsidiaries is derived exclusively from these two mining operations. Neither Golden Star Resources nor its subsidiaries have any productive mining operations in Colorado. With respect to Golden Star Resources' mining operations, the day-to-day operational decisions are made in Ghana, not Colorado. For example, all decisions concerning operational personnel (except the most senior

managers) are made in Ghana. Similarly, decisions concerning mine planning, mining, manpower and equipment usage are made in Ghana, not Colorado.

13.    In addition to its two operating gold mines in Ghana, Golden Star Resources, through its subsidiaries, also has interests in approximately 15 other properties which may have development potential. These properties are located in West Africa (Ghana, Cote d'Ivoire, Sierra Leone, Burkina Faso, Niger) and, to a lesser extent, Latin America (French Guiana, Brazil and Suriname). None of the properties are located in the United States.

14.    The mining Concession described in the Verified Complaint as the "Adum Banso" gold concession is located in Ghana, and presently is referred to as the "Hwini-Butre" concession. There is no active production from the Concession, but the property is under development and production currently is expected in 2008.

15.    Golden Star Resources owns an interest in the Concession through St. Jude Resources and St. Jude Resources' Ghanaian subsidiary, First Canadian Goldfields Ltd. (Ghana).

16.    St. Jude Resources is a Canadian gold prospecting and mining corporation established in May 1985 under the Canada Business Corporations Act. Golden Star Resources acquired St. Jude Resources pursuant to a plan of arrangement under the Canada Business Corporations Act in December 2005. At the time of the acquisition, virtually all of St. Jude Resources' physical assets, employees and operations were located in Ghana. St. Jude Resources' administrative office technically is located in Colorado. However, St. Jude Resources does not have any employees in Colorado. The registered and records office of St. Jude Resources is in Toronto, Canada.

17.    In accordance with the Ghanaian Minerals and Mining Act of 2006 and the various agreements and Court Orders which are the subject of this case, St. Jude Resources owns a 90% interest in the Concession through its Ghanaian subsidiary, First Canadian Goldfields Ltd. (Ghana). The Government of Ghana holds a 10% carried interest in the Concession.

18.    Neither Golden Star Resources nor St. Jude Resources maintains offices in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever maintained offices or facilities of any type in the District of Columbia.

19.    Neither Golden Star Resources nor St. Jude Resources has any employees, officers or directors in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever had any employees, officers or directors in the District of Columbia.

20.    Neither Golden Star Resources nor St. Jude Resources owns or leases any real or personal property in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever owned or leased any real or personal property in the District of Columbia.

21.    Neither Golden Star Resources nor St. Jude Resources pays taxes in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever paid taxes in the District of Columbia.

22.    Neither Golden Star Resources nor St. Jude Resources has any agents or distributors in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever had agents or distributors in the District of Columbia.

23.    Neither Golden Star Resources nor St. Jude Resources has any telephone numbers or mailboxes in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever had any telephone numbers or mailboxes in the District of Columbia.

24.    Neither Golden Star Resources nor St. Jude Resources has any bank or other financial accounts in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever had any bank or financial accounts in the District of Columbia.

25.    Neither Golden Star Resources nor St. Jude Resources conducts mining or exploration activities in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever conducted mining or exploration activities in the District of Columbia.

26.    Neither Golden Star Resources nor St. Jude Resources sells any mined or refined gold products in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever sold any mined or refined gold products in the District of Columbia.

27.    Based upon my knowledge and inquiry, neither Golden Star Resources nor St. Jude Resources has ever been served with judicial process in the District of Columbia.

28.    Based upon my knowledge and inquiry, neither Golden Star Resources nor St. Jude Resources has ever been sued in the District of Columbia prior to this litigation.

29.    Based upon my knowledge and inquiry, neither Golden Star Resources nor St. Jude Resources has ever instituted legal proceedings in the District of Columbia.

30.    Neither Golden Star Resources nor St. Jude Resources is registered to do business in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever been registered to do business in the District of Columbia.

31.    Neither Golden Star Resources nor St. Jude Resources has a registered agent for service of process in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever had a registered agent for service of process in the District of Columbia.

32.    Neither Golden Star Resources nor St. Jude Resources has any assets in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever had any assets in the District of Columbia.

33.    Based upon my knowledge and inquiry, neither Golden Star Resources nor St. Jude Resources has ever initiated any communications with B.D. Goldfields, Ltd. in the District of Columbia.

34.    Based upon my knowledge and inquiry, neither Golden Star Resources nor St. Jude Resources has ever initiated any communications with Paul Oteng in the District of Columbia.

35.    Neither Golden Star Resources nor St. Jude Resources transacts business in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever transacted business in the District of Columbia.

36.    Neither Golden Star Resources nor St. Jude Resources derives any income from transactions in the District of Columbia and, based upon my knowledge and inquiry, neither company has ever derived any income from transactions in the District of Columbia.

37.    Based upon my knowledge and inquiry, neither Golden Star Resources nor St. Jude Resources has ever entered into any contracts with residents of the District of Columbia.

38.    Attached to this Affidavit as Exhibit A is a true and correct copy of the November 15, 1994 Concession Contract between B.D. Goldfields, Ltd. and St. Jude Resources ("1994 Concession Contract").

39.    At the time that B.D. Goldfields, Ltd. and St. Jude Resources entered into the 1994 Concession Contract, St. Jude Resources listed its address in Canada and, based upon my knowledge and inquiry, had no offices in the United States.

40.    The 1994 Concession Contract states that it is governed by Ghanaian law.

41.    Attached to this Affidavit as Exhibit B is a true and correct copy of the August 26, 2005 Concession Contract between B.D. Goldfields, Ltd. and St. Jude Resources ("2005 Concession Contract").

42.    At the time that B.D. Goldfields, Ltd. and St. Jude Resources entered into the 2005 Concession Contract, St. Jude Resources listed its address in Canada and, based upon my knowledge and inquiry, had no offices in the United States.

43.    The 2005 Concession Contract states that it is governed by Ghanaian law.

44.    Attached to this Affidavit as Exhibit C is a true and correct copy of the January 31, 2006 Deed of Settlement between B.D. Goldfields, Ltd. and St. Jude Resources ("2006 Settlement Agreement") as obtained from the corporate records of Golden Star Resources.

45.    At the time that B.D. Goldfields, Ltd. and St. Jude Resources entered into the 2006 Settlement Agreement, St. Jude Resources listed its address in Canada.

46.    Attached to this Affidavit as <u>Exhibit D</u> is a copy of the Order, dated February 7, 2006, of the Superior Court of Judicature in the Court of Appeal (Civil Division) of Ghana, approving and giving effect to the terms of the 2006 Settlement Agreement.

47.    After the Order approving the Settlement Agreement, the Government of Ghana, through the Ghana Ministry of Mines, issued a new License for the Concession in favor of St. Jude Resources and/or its nominee.  Attached as <u>Exhibit E</u> is a copy of the License, dated March 10, 2008, issued by the Ghanaian Government consistent with the Settlement Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 3, 2008.

_____
Roger Palmer, Vice President Finance and
Interim Chief Financial Officer,
Golden Star Resources Ltd.

STATE OF COLORADO        )
                         ) ss.
CITY OF LITTLETON        )

SUBSCRIBED AND SWORN to me this 3 day of July, 2008, at Littleton, Colorado. Witness my hand and official seal.



_____
Notary Public

My commission expires:  _09-16-2009_

- 6 -

# EXHIBIT A



14TH FLOOR, 888 DUNSMUIR STREET VANCOUVER, B.C. V6C 3K4 CANADA
PHONE: (604) 683-5848  FAX: (604) 683-0798

· (VSE) TRADING SYMBOL #JD ·

# LETTER AGREEMENT

Dated for reference the 15th day of November, 1994.

Nana Fiifii Kakraba Hayford,
Managing Director
B.D. Goldfields Ltd.
c/o  Major & Company Buildings
Near Children's Hospital
Box 3422
Accra, Ghana, West Africa

Dear Nana Hayford:

RE:    Agreement on the Dabikrom Prospecting Concession, Western Region, Ghana
       (hereinafter referred to as the "Property")

---

This letter sets the terms of agreement between St. Jude Resources Ltd. (hereinafter
referred to as "us", "we" or "St. Jude"), and B.D. Goldfields Ltd. and / or Dabikrom
Integrated Co. Ltd. (if applicable), (hereinafter referred to as "you" or "B.D. Goldfields").

It is intended, and agreed that, when executed by you, this letter will in consideration of
the mutual covenants and agreements herein set forth, constitute a binding agreement
between St. Jude and B.D. Goldfields and supersede all previous agreements or
understandings, written or verbal.

## 1.    REPRESENTATIONS

B.D. Goldfields represents and warrants that:

a)    the mineral claims, concessions or areas (the "Property") described in
      Schedule "A" attached hereto, are properly and legally recorded and are presently
      in good standing under the laws of the jurisdiction in which they are located and
      the Property is free and clear of all liens, charges or encumbrances, except as

- 2 -

described herein, and is otherwise in good standing;

b)   you are, or are entitled to be the recorded and beneficial holder of a 100% right, title and interest in and to the Property, subject to a 10% net proceeds interest reserved for the Government of the Republic of Ghana ("Ghana Interest");

c)   you have the sole and complete power to deal with the Property, subject to the terms of the agreement between the Government of Ghana ("Ghana Agreement"), and B.D. Goldfields (or Dabikrom Integrated Co. Ltd.) with respect to the property;

d)   there are no adverse claims or challenges against or to the ownership of or title to any of the area comprising the Property, not to the best of your knowledge, nor to the best of your knowledge is there any basis therefor;

e)   except for the Lutz agreement referred to in paragraph 12, there are no outstanding agreements or options to acquire the Property or any interest in or portion thereof, and there are no royalty or other interests held in respect of the Property or any part thereof save as described in this paragraph 1;

f)   all corporate authorizations have been obtained by you for the execution of this Letter Agreement and for the performance of this Letter Agreement by you.

Such representations and warranties shall survive the execution of this Letter Agreement.


2.   **GRANT**

In consideration of the payments described in paragraph 3, you hereby agree to grant to St. Jude directly, or by means of a joint venture company:

a)   an irrevocable right to purchase up to a 80% right, title and interest in and to the Property exclusive of the Ghana Interest reserved in the Ghana Agreement;

b)   immediate, exclusive and quiet possession of the Property for the purposes of prospecting, exploring and developing it as we in our sole discretion may determine.


3.   **PAYMENT SCHEDULE**

B.D. Goldfields hereby agrees to sell to St. Jude up to a 80% interest in the Property for the total purchase price of $250,000.00 US dollars. This purchase price shall be paid as

*NFKH*
*R. K. II.*

- 3 -

follows:

a)  <u>Initial Payments:</u>

There shall be initial payments totalling $50,000.00 US dollars, which shall be paid as follows:

$ 2,500.00   Upon execution of this Agreement. The receipt and sufficiency of which is hereby acknowledged.

$ 10,000.00   On or before December 7, 1994.

$ 20,000.00   On or before January 31, 1995.

$ 17,500.00   On or before April 30, 1995.

b)  Upon payment of all of the initial payments totalling $50,000.00 US dollars, St. Jude shall be deemed to have acquired a 35% interest in the Property. St. Jude shall have the irrevocable right to acquire a further 45% interest in the Property by making a further payment in the amount of $200,000.00 US dollars to B.D. Goldfields as follows:

i)  $100,000.00 US dollars on or before December 31, 1995; and
ii)  $100,000.00 US dollars on or before December 31, 1996; or when a mining licence is issued for the Property, whichever shall first occur.

c)  Once the payments in paragraph (b) above have been made, the ownership in the Property will be as follows:

St. Jude - 80% participating interest;
B.D. Goldfields - 10% non-dilutable interest, plus an option to purchase an additional 5% interest, pursuant to paragraph 6 hereof;
Government of Ghana - 10%.

4.  **OBLIGATIONS OF ST. JUDE**

During the currency of this Agreement, the parties hereto agree that once St. Jude has paid the initial payments totalling $50,000.00 US dollars to B.D. Goldfields, it shall have been deemed to have given you a commitment to ensure that the Property is properly explored and developed by means of a variety of geological, geophysical and geochemical techniques. St. Jude will then be required to make formal application for a mining

*NFKH*
*R. K. S.*

- 4 -

licence on the Property during the term of the existing prospecting licence or any valid extensions thereof.

St. Jude shall ensure that all work done on the Property is done in a good and workmanlike manner.

5. **JOINT VENTURE**

Without in any way amending the obligations of either party to this Agreement, the parties hereby agree, prior to bringing the Property into production, to enter into a more formal joint venture agreement which will incorporate the terms of this Agreement and allow for, among other things:

a)  Assignment to associated companies;
b)  Operator;
c)  Standard boiler plate language;
d)  Programs;
e)  Production in kind, etc;
f)  Rights of First Refusal and Disposition;
g)  Production decisions;
h)  Directorship for Nana Hayford, and possibly others, in joint venture company.

6. **OPTION TO PURCHASE**

The parties agree that for a period of five years after the Property goes into commercial production, B.D. Goldfields shall have an option to acquire from St. Jude an additional 5%, (over and above its original 10% interest in the joint venture company), at fair market value as determined by an independent business evaluator.

7. **FIRST RIGHT OF REFUSAL TO ACQUIRE INTEREST**

If B.D. Goldfields chooses to sell any of its interest in the Property or in the joint venture company, St. Jude shall have a first right of refusal to acquire the interest on the same conditions as the purchaser as per this paragraph 7. In the event that B.D. Goldfields receives an offer from a third party to purchase or otherwise acquire some or all of your above described interest, you shall prior to accepting the same, provide us with written notice setting out the terms thereof. We shall have 30 days from receipt of said notice in which to advise you in writing of our intent to purchase or otherwise acquire the said interest.

- 5 -

In the event that we do not so advise you in writing within the said 30 day period, you shall be entitled to accept the offer of said third party. However if such offer is not accepted within 60 days of the receipt of such offer, our first right of refusal will be reinstated in respect of any such other offer.

### 8.    OPERATOR

St. Jude will be operator on the property until such time as this Agreement terminates or St. Jude resigns as operator.

### 9.    MAINTENANCE OF THE PROPERTY

St. Jude will keep the Property (prospecting concession) in good standing during the currency of this Agreement.

### 10.    REPORTING

St. Jude will provide B.D. Goldfields with quarterly financial and technical reports on the Property and the two groups will meet periodically to discuss the work progress and results. If at any point St. Jude terminates this Agreement, it will turn over complete copies of all technical information on the Property to B.D. Goldfields.

### 11.    ASSIGNMENT

St. Jude reserves the right to assign any or all of its interest to the Property.

### 12.    AREA OF INTEREST

Any additional mining concessions acquired by B.D. Goldfields, or any of its officers, agents and employees, either directly or indirectly, within a five km. distance of any boundary of the Property, shall be included and be deemed to form part of the Property at the election of St. Jude, and shall be governed by the terms of this Agreement. St. Jude shall not be required to pay further consideration for any additional lands however, St. Jude shall be required to maintain these lands in good standing if it elects to have them included as part of this Agreement.

Likewise any additional concessions acquired by St. Jude during the term of this Agreement within a five km. distance of any boundary of the Property, shall also be

deemed to be included as part of the Property and shall be governed by the terms of this Agreement.

B.D. Goldfields agrees that it shall cooperate fully with St. Jude to re-acquire any portion of the Property which has been shed from the original prospecting licence ("Shed Lands"), and once re-acquired, the Shed Lands will be deemed to form part of the Property and be governed by this Agreement.

## 3.    PRIOR AGREEMENTS

The parties acknowledge that on July 18, 1989, B.D. Goldfields had entered into a joint venture agreement on the Property with Lutz Resources K/S of Denmark, (hereinafter referred to as the "Lutz agreement"), which agreement resulted in the concession being transferred to Southwestern Goldfields Limited, a joint venture company.

B.D. Goldfields represents and warrants that it has taken the necessary legal steps to have all of its obligations pursuant to the Lutz agreement terminated by order of a court of competent jurisdiction.

This agreement contemplates that the Lutz agreement is at an end and that Lutz Resources has no further interest in the Property whatsoever.

## 14.    RIGHT OF ENTRY

Throughout the currency of this Agreement, the Directors and Officers of St. Jude and its servants, agents and independent contractors shall:

a)    have the sole and exclusive right in respect of the Property to enter thereon

b)    have exclusive and quiet possession thereof;

c)    do such prospecting, exploration, development and / or other mining work thereon or under as St. Jude in its sole discretion may determine advisable;

d)    bring upon, and erect upon the Property buildings, plants, machinery and equipment as St. Jude may deem advisable;

e)    remove therefrom and dispose of any reasonable quantities of ores, minerals and metals for the purposes of obtaining any assays and making other tests.

- 7 -

## 15.   FURTHER ASSURANCES

Both parties agree to execute any other documents and to perform such other acts as may be necessary with respect to or to clarify the intent of and give full force and effect to this Agreement as may reasonably be requested by either party.

## 16.   CHANGES IN AGREEMENT

Either party will be bound by the terms of this Agreement unless all parties are in agreement to appropriate changes.

## 17.   FORCE MAJEURE

No party shall be liable for its failure to perform any of its obligations under this Agreement due to a cause beyond its control, except those caused by its own lack of funds, including but not limited to acts of God, fire, Flood, explosion; strikes, walk-outs or other industrial disturbances, laws, rules or regulations or orders of any duly constituted court or governmental authority, or non-availability of materials or transportation (each an "Intervening Event").

All time limits imposed by this Agreement will be extended by a period equivalent to the period of delay resulting from an Intervening Event described in this paragraph 17.

A party relying on the provisions of this paragraph 17 will take all reasonable steps to eliminate any Intervening Event and if possible, will perform its obligations under this Agreement as far as practical, but nothing herein will require such party to settle or adjust any labour dispute or to question or to test the validity of any law, rule, regulation or order of any duly constituted court or governmental authority or to complete its obligations under this Agreement, if an Intervening Event renders completion impossible.

A party relying on the provision of this paragraph 17 shall give notice to the other party forthwith upon the occurrence of the Intervening Event and forthwith after the end of the period of delay, when such Intervening Event has been eliminated or rectified.

## 18.   NOTICE

Any notice, direction or other communication required or permitted to be given hereunder will be given to all parties and shall be deemed to be sufficiently given if it is delivered or sent by telex, facsimile, transfer or some other similar form of telecommunication, any such notice, direction or other communication will, if delivered,

- 8 -

be deemed to have been given and received on the next business day following the day on which it was so sent. A business day will mean a day upon which Canadian Chartered Banks are open for the transaction of business.

The parties addresses for notice are as follows:

B.D. Goldfields Ltd.
P.O. Box 3422
Accra, Ghana, West Africa
Phone: 669 - 205

St. Jude Resources Ltd.
14th Floor, 888 Dunsmuir Street
Vancouver, British Columbia
Canada, V6C 3K4
Phone: (604) 683 - 5848
Fax: (604) 683 - 8798

Either party may change its address by notice to the other.

19.  **GOVERNING LAW**

This Agreement shall be governed by the laws of the Republic of Ghana.

20.  **ENTIRE AGREEMENT**

This Agreement and the Schedules attached hereto constitute the entire Agreement among us and supersedes every previous agreement, communication, expectation, negotiation, representation or understanding, whether oral or written, express or implied, statutory or otherwise, among us with respect to the subject matter of this Agreement.

Yours very truly,

ST. JUDE RESOURCES LTD.

PER: _____
Michael A. Terrell

PER: _____
Ken Germundson

Witness (Print Name)
ISAAC EMMANUEL AMOH.

Witness (Print Name)

The foregoing truly represents our Agreement in this respect and we agree to be bound

- 9 -

by and comply with the terms hereof.

B.D. GOLDFIELDS LTD.
B. D. GOLDFIELDS LIMITED
PER:
Nana Fiifii Kakraba Hayford
Executive Chairman

PAUL TETTEY-AGBO THOMPSON

Witness (Print Name)

Nana Fiifii Kakraba Hayford

Witness (Print Name)

And if necessary:

DABIKROM INTEGRATED CO. LTD.

PER:
Nana Fiifii Kakraba Hayford

Witness (Print Name)

- 9 -

by and comply with the terms hereof.

**B.D. GOLDFIELDS LTD.**

PER: _____
Nana Fiifii Kakraba Hayford

_____
Nana Fiifii Kakraba Hayford

And if necessary:

**DABIKROM INTEGRATED CO. LTD.**

PER: _____
Nana Fiifii Kakraba Hayford

PAUL TETTEY-ACBO THOMPSON
_____
Witness (Print Name)

_____
Witness (Print Name)

_____
Witness (Print Name)

# SCHEDULE "A"

Those lands described in the prospecting licence agreement which was initially dated May 30, 1988, between the Government of the Republic of Ghana and Dabikrom Integrated Co. Ltd. as better outlined on the concession map which forms part of the original prospecting licence, copies of which are attached hereto.

The prospecting licence has been renewed to December 31, 1996.

The parties acknowledge that some of these lands may have been shed due to applicable legislation however, the parties acknowledge that any lands which have been shed from the original concession, shall be re-applied for and shall be governed by this Agreement and form part of the Property.

# EXHIBIT B

<u>DEED</u>

DATED 26th AUGUST 2005

BETWEEN

BD GOLDFIELDS LIMITED

AND

ST. JUDE RESOURCES LIMITED

<u>DEED</u>

THIS DEED is made this 26th day of August 2005 BETWEEN B D COLDFIELDS LIMITED having its registered offices at 4 Graphic Road, Adabraka, Accra with its postal address as P.O. Box GP 3422 Accra, Ghana, West Africa (hereinafter called "the Assignor") of the one part AND ST. JUDE RESOURCES LIMITED of Suite #200, 5405 - 48th Avenue Delta, British Columbia Canada. V4K 1W6 (hereinafter called "the Assignee") of the other part.

### THIS DEED WITNESSETH AS FOLLOWS:

1.  Definitions and Interpretation

| | |
|---|---|
| "the Concession" | means all that area covered by the Prospecting Licence (as defined herein) and more particularly described in the Prospecting Licence. |
| "the Judgment" | means the judgment of the High Court of Ghana dated 28 January 2004 in Suit No FT (IV) 6/2001 Hwini Butre Minerals Limited vrs the Minister for Mines and Energy and 3 others. |
| "the Litigation" | Suit No FT (IV) 6/2001 Hwini Butre Minerals Limited vrs the Minister for Mines and Energy and 3 others (Suit No FT (IV) 6/2001) now pending before the Court of Appeal of the Republic of Ghana. The Litigation shall include the judgment of the High Court of Ghana dated 28 January 2004 in Suit No FT (IV) 6/2001, all applications before any court in Ghana and any appeals to any court in Ghana in respect of the dispute between the parties in respect of the Concession |
| "the Original Agreement" | means the agreement dated 15 November 1994 between the Assignor and the Assignee. |
| "the January Agreement" | means the agreement dated 21 January 2005 between the Assignor and the Assignee which, inter alia, superseded the Original Agreement. |
| "the Prospecting Licence" | means the prospecting licence dated 30 May 1998 between the Government of Ghana and the Assignor (then called Dabikrom Integrated Company Limited) as renewed from time to time. |

2.  In consideration of the sum of US$2,000,000 (two million United States Dollars) ("the Sum") payable by the Assignee to the Assignor in the manner hereinafter following, the Assignor hereby ASSIGNS unto and to the Assignee all its rights, title and interest in the Prospecting Licence and in the Concession and in and to the Litigation.

3.  The Sum shall be paid in the following manner:

FROM : REINDORF CHAMBERS    PHONE NO. : 233 21 220218    Aug. 26 2005 04:14PM P4

(i)  US$10.000 (ten thousand United States Dollars) immediately (the receipt of which the Assignor hereby acknowledges);

(ii)  US$40.000 (forty thousand United States Dollars) by wire transfer to a bank account to be provided by the Assignor in writing to the Assignee

(iii)  US$450.000 (four hundred and fifty thousand United States Dollars) on or before 15th September 2005 provided that the Assignor has executed all of the documents required to be executed by it pursuant to clause 7 herein;

(iv)  US$500.000 (five hundred thousand United States Dollars) on or before 1 January 2006;

(v)  US$500.000 (five hundred thousand United States Dollars) on or before 1 July 2006; and

(vi)  US$500.000 (five hundred thousand United States Dollars) on or before 1 January 2007

4.  The Assignor irrevocably and indefeasibly covenants that this Deed is in full and final satisfaction of all its rights and interests in and to the Concession, the Prospecting Licence, under the Original Agreement and the January Agreement and in and to the Litigation.

5.  The Assignor hereby irrevocably and indefeasibly releases the Assignee forever from all and any claims to any right title or interest in or to the Concession and the Prospecting Licence and in respect of all its rights under the Original Agreement and the January Agreement and in and to the Litigation

6   The Assignor hereby irrevocably and indefeasibly covenants that it shall have no claim to any right title or interest in and to the Concession or the Prospecting Licence and the Litigation. The Assignor irrevocably and indefeasibly covenants and acknowledges that its only claims against the Assignee or its nominee or any person claiming under it in respect of the Original Agreement, the January Agreement, this Deed and the Concession would be for the payment of any sums under sub-clauses 3 (ii), 3(iii), 3(iv), 3(v) and 3(vi) as the case may be. The Assignor covenants that it shall not bring or institute any proceedings of whatever nature against the Assignee in respect of the Concession or the Prospecting Licence.

7   That the Assignee shall peaceably and quietly hold and enjoy the Concession and the Prospecting Licence without any disturbance or interruption from or by the Assignor, its assigns, officers, directors, successors and or any person rightfully claiming by, under or in trust for it

8   The Assignor hereby irrevocably and indefeasibly covenants to promptly execute all documents, deeds, settlement agreements and other instruments of further assurance which may be reasonably necessary or advisable to carry out fully the intent of this Deed and the settlement or compromise of the Litigation. In particular and without prejudice to the foregoing, the Assignor irrevocably and indefeasibly covenants to execute a power of attorney authorising the Assignee or its nominee to execute on its behalf all such documents as it deems necessary in respect of the settlement or compromise of the Litigation. For the avoidance of doubt, the Assignor hereby consents to any application to the Minister responsible for Mines for the assignment of the Prospecting Licence to the Assignee or its nominee.

9.  This Deed shall enure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

10.  This Deed shall be governed by the laws of the Republic of Ghana.

11.  This Deed may be executed by original and/or facsimile signatures and in as many counterparts as may be necessary, each of which when signed, shall be deemed to be an original, and such counterparts together shall constitute one and the same instrument, notwithstanding the date of execution, which shall be

deemed to bear the date as set forth above

12    The Assignor warrants that it has all of the necessary directors and shareholders approvals which may be required by its Regulations and any applicable legislation to enter into this Agreement. The Assignor further warrants that it has no interest in Hwini Butre Minerals Limited ("Hwini Butre") and for the avoidance of doubt hereby releases Hwini Butre, the Assignee. Crew Gold Corporation and Lutz Resources Limited from any claim and all claims in and to Hwini Butre and any of its shares

13    For the avoidance of doubt, this Deed supercedes all previous agreements between the parties and embodies the entire understanding of the parties in respect of the matters contained or referred to in it and there are no promises, terms, conditions or obligations, oral or written, express or implied other than those contained herein.

IN WITNESS whereof the parties have by their duly authorised representatives executed this Deed the day and year first above written.

**B. D. GOLDFIELDS LTD.**

SIGNED SEALED AND DELIVERED
By Nana Fiifi Kakraba Hayford            )
On behalf of BD Goldfields Limited       )

in the presence of

Name.    Ben. N. Addison

Address:    P. O. Box 3422 AR.

Occupation:    DIRECTOR

SIGNED SEALED AND DELIVERED  )
On behalf of St. Jude Resources Ltd )
By                          in the  )
presence of                         )  ...............

Name.

Address:

Occupation.

deemed to bear the date as set forth above.

12. The Assignor warrants that it has all of the necessary directors and shareholders approvals which may be required by its Regulations and any applicable legislation to enter into this Agreement. The Assignor further warrants that it has no interest in Hwini Butre Minerals Limited ("Hwini Butre") and for the avoidance of doubt hereby releases Hwini Butre, the Assignee, Crew Gold Corporation and Lutz Resources Limited from any claim and all claims in and to Hwini Butre and any of its shares.

13. For the avoidance of doubt, this Deed supercedes all previous agreements between the parties and embodies the entire understanding of the parties in respect of the matters contained or referred to in it and there are no promises, terms, conditions or obligations, oral or written, express or implied other than those contained herein.

IN WITNESS whereof the parties have by their duly authorised representatives executed this Deed the day and year first above written.

B. D. GOLDFIELDS LTD.

SIGNED SEALED AND DELIVERED )
By Nana Fiifi Kakraba Hayford )
On behalf of BD Goldfields Limited )

in the presence of:

Name:   BEN N. ADDISON

Address   P. O. BOX 3422 AR.

Occupation   DIRECTOR

SIGNED SEALED AND DELIVERED )
On behalf of St Jude Resources Ltd )
By _Michael Terrell_ in the )
presence of: )

Name   Mary-Jane Hamula

Address   #500, 5405-48 Avenue
Delta, British Columbia

Occupation   Canada, V4K 1W6

Officer:   Corporate Secretary

OATH OF EXECUTION

I, BENJAMIN N. ADDISON of Accra make oath and say that on the

day of 26th Aug 2005 I was present and saw NANA FIFI K. HAYFORD duly

execute the Instrument now produced to me and marked "A" and that the said NANA FIFI K. HAYFORD

can read and write

SWORN AT ACCRA, THIS

DAY OF                          2005

                    BEFORE ME


REGISTRAR OF LANDS


OATH OF PROOF

On the          day of                    2005 at            o'clock in the            noon

this Instrument was proved before me by the oath of the within-named

to have been duly executed by the within-named ......... ... ... .. ...


REGISTRAR OF LANDS

# EXHIBIT C

DEED OF SETTLEMENT

DATED 31ˢᵗ JANUARY 2006

BETWEEN

HWINI BUTRE MINERALS LIMITED

AND

BD GOLDFIELDS LIMITED

AND

THE MINERALS COMMISSION

AND

THE MINISTER RESPONSIBLE FOR MINES

AND

THE ATTORNEY-GENERAL OF GHANA

AND

ST. JUDE RESOURCES LTD

THIS DEED OF SETTLEMENT (the Deed) is made this 31st day of January 2006 between

Hwini Butre Minerals Limited a limited liability company incorporated under the laws of Ghana of Sena Chambers, Third Floor, Mobil House, 25 Liberia Road, Accra (hereinafter called "Hwini Butre") of the first part;

B.D. Goldfields Limited a limited liability company incorporated under the laws of Ghana of 4 Graphic Road, Adabraka, Accra with its postal address as P.O. Box GP 3422, Accra, Ghana (hereinafter called "BD Goldfields") of the second part

The Minerals Commission a statutory body established under the Minerals Commission Act, 1993 (Act 450) (hereinafter called "the Commission") of the third part

The Minister responsible for mines (hereinafter called "the Minister") of the fourth part

The Attorney General of Ghana on behalf of the Republic of Ghana (hereinafter called the Government") of the fifth part

St. Jude Resources Ltd a public company incorporated under the laws of Canada of Suite #200, 5405 - 48th Avenue, Delta, British Columbia, Canada, V4K 1W6 .(hereinafter called "St. Jude") of the sixth part

WHEREAS

a.    By the Prospecting Licence (as defined in clause 1 herein), Dabikrom Intergrated Company Limited (now B.D. Goldfields) was granted the rights to prospect for gold in the Concession (as defined in clause 1 herein).

b.    By a Letter Agreement dated for reference November 15, 1994 (hereinafter referred to as the "Original Agreement") between St. Jude and BD Goldfields, BD Goldfields agreed to grant to St. Jude the right to purchase an 80% right, title and interest in and to the Prospecting Licence and the Concession.

c.    By an agreement dated for reference 8 February 1995 ("the Original SJR/HBM Agreement") and made between St. Jude and Hwini Butre, St. Jude and Hwini Butre agreed, on and subject to the terms thereof, to establish a joint venture company for the purpose of holding the Prospecting Licence and conducting the exploration of the Concession pursuant thereto.

d.    St. Jude has to date expended sums well in excess of US10,000,000 (ten million United States Dollars) in work expenditure on the Concession thereby maintaining the Concession in good standing.

Further, St. Jude has, as evidenced by a letter agreement dated 18 February 2004 between St. Jude and BD Goldfields, paid BD Goldfields the amounts required pursuant to the Original Agreement to purchase an 80% interest in the Prospecting Licence and the Concession. St. Jude is therefore entitled to an 80% right, title and interest in the Prospecting Licence and in the Concession pursuant to the Original Agreement.

e.   By the Judgment, (as defined in clause 1 hereof) the High Court declared, inter alia, that, BD Goldfields was the legal owner of the Prospecting Licence and the Concession. The Court also ordered the Minerals Commission to "take immediate steps to regularise the ownership" of the Prospecting Licence in BD Goldfields.

f.   Hwini Butre, in furtherance of its claim to the equitable ownership of the Prospecting Licence and the Concession and aggrieved by the Judgment, by a notice of appeal dated 29 January 2004 (as amended pursuant to the order of the Court of Appeal) appealed to the Court of Appeal against the Judgment. The Commission by a notice of appeal dated 4 February 2004 appealed to the Court of Appeal against the Judgment.

g.   By the August 2005 Deed as amended by the Amending Deed, BD Goldfields assigned all its rights, title and interest in and to the Prospecting Licence, the Concession, the Judgment and the Litigation to St. Jude to the extent not transferred pursuant to the Original Agreement.

i.   Hwini Butre and BD Goldfields are desirous of ensuring that the Prospecting Licence is vested in St. Jude [or its nominee] and of obtaining an order of the Court of Appeal to achieve that effect. The Attorney-General, the Minister and the Commission are each interested in the expeditious development of the Concession and are agreeable to the vesting of the Prospecting Licence in St. Jude or its nominee. The parties recognise that the Litigation has resulted in great costs to the parties and have agreed in their mutual interests to settle irrevocably the Litigation on and subject to the terms and conditions hereinafter following.

NOW THIS DEED WITNESSETH as follows:

1.   Definitions and Interpretation

"the Amending Deed"        means the deed dated 21 December 2005 between St. Jude and BD Goldfields.

"the August 2005 Deed"     means the deed dated 26 August 2005 between St. Jude and BD Goldfields.

2

| "the Concession" | means all that area covered by the Prospecting Licence and more particularly described therein. |
|---|---|
| "the Judgment" | means the judgment of the High Court of Ghana dated 28 January 2004 in Suit No FT (IV) 6/2001 Hwini Butre Minerals Limited vrs the Minister for Mines and Energy and 3 others. |
| "the Litigation" | means the dispute between Hwini Butre, the Minister , the Attorney-General, the Commission and BD Goldfields now pending before the Court of Appeal in Ghana in Suit No FT (IV) 6/2001 Hwini Butre Minerals Limited vrs the Minister for Mines and Energy and 3 others. The Litigation includes all applications before any court in Ghana and any appeals to any court in Ghana in respect of the dispute between the parties in respect of the Concession and the Prospecting Licence. |
| "the Prospecting Licence" | means the prospecting licence dated 30 May 1988 between the Government of Ghana and Dabikrom Integrated Company Limited (now B.D. Goldfields Limited) as renewed from time to time. |

**2.    Court of Appeal Consent Order**

2.1    Each of the parties hereby consents to an order in the terms set out in clause 2.2 hereof.

2.2    The parties agree that upon the execution of this Deed by all the parties hereto Hwini Butre by its counsel shall take steps to list the matter before the Court of Appeal to have a consent order entered in the following terms

" 1. That having regard to the fact that Hwini Butre Minerals Limited has agreed to waive all of its rights and claims to the Prospecting Licence dated 30 May 1988 between the Government of Ghana and BD Goldfields Limited, the third Respondent herein (the Prospecting Licence)and therefore hereby abandons the Litigation;

and

3

2. That having regard to the fact that BD Goldfields has assigned all of its rights, interest and claims to the Prospecting Licence to St. Jude Resources Ltd and the parties having agreed to terms of settlement by a deed dated 24/21/22 and consenting that the following orders be entered by the Court in full and final satisfaction of all the claims, appeals and issues between the parties in respect of the Prospecting Licence;

and

3. That having regard to the fact of this settlement the Minerals Commission has agreed to abandon its appeal.

It is hereby ordered that:

a.      That the appeals of the Minerals Commission and Hwini Butre Minerals Limited are hereby struck out as settled;

b.      The Minister for Mines is hereby ordered on condition that all requisite statutory conditions are met, to issue a new prospecting licence in respect of the area covered by the Prospecting Licence to St. Jude Resources Ltd or its nominee

c.      There will be no order as to costs."

3.      Development of the Concession

St. Jude or its nominee shall on the execution of this Deed by all the parties be immediately entitled to work and operate the Concession and to exercise all the rights incident to the holder thereof, free and clear of all liens, claims and encumbrances of any nature whatsoever, including the right to apply for a mining lease in respect of the Concession and shall be subject to all the obligations thereunder.

4.      Quiet Enjoyment

4.1     Hwini Butre covenants that St. Jude or its nominee will have exclusive and quiet possession of the Concession and the Prospecting Licence and that neither they nor their officers, directors or any other persons claiming through them or in trust for them or as their agents will interfere directly or indirectly with or in any way howsoever disturb St. Jude's or its nominee's quiet possession of the Concession and the Prospecting Licence.

4.2     BD Goldfields covenants that St. Jude or its nominee will have exclusive and quiet possession of the Concession and the Prospecting Licence and that neither they nor their officers, directors or any other persons claiming through them or in trust for them or as their agents will interfere directly or indirectly with or in any way howsoever disturb

4

St. Jude or its nominee's quiet possession of the Concession and the Prospecting Licence.

5.    Undertakings by the Minerals Commission and the Minister for Mines

5.1    It is hereby understood that the execution of this Deed by the Minister and the Commission signifies the Minister's consent pursuant to section 19 of the Minerals and Mining Law, 1983 (P.N.D.C.L. 153) to the Original Agreement and the August 2005 Deed as amended by the Amending Deed.

5.2    The Commission hereby undertakes to recommend to the Minister the grant of a mining lease to St. Jude or its nominee in respect of the Concession provided that it is satisfied that St. Jude is in full compliance with all its obligations under law and under the Prospecting Licence for the grant of a mining lease.

6.    Warranties

Hwini Butre, BD Goldfields and St. Jude each warrants that it has all of the necessary approvals which may be required by its Regulations and any applicable legislation to enter into this Deed.

7.    Releases

7.1    Hwini Butre hereby irrevocably and indefeasibly releases:

i. St. Jude forever from all claims, liabilities and obligations in respect of the Litigation and the Prospecting Licence;

ii. BD Goldfields forever from all claims, liabilities and obligations in respect of the Litigation and the Prospecting Licence; and

iii. the Attorney- General and the Commission forever from all claims, liabilities and obligations in respect of the Litigation.

7.2    BD Goldfields hereby irrevocably and indefeasibly releases St. Jude, Hwini Butre, the Attorney-General, the Minister and the Commission forever from all claims, liabilities and obligations in respect of the Litigation, the Prospecting Licence and the Concession.

7.3    Each party hereby irrevocably and indefeasibly releases each other party forever from all claims, liabilities and issues arising out of or in respect of or in connection with the Litigation.

5

8.    **Further Assurances**

Each of the parties hereby agrees and undertakes to execute all such documents and to perform such other acts as may be necessary with respect to, or to clarify the intent of and to give full force and effect to this Deed as may be reasonably requested by a party.

IN WITNESS WHEREOF each of the parties has caused its duly authorised representative to sign seal and deliver this Deed on its behalf,

SIGNED BY
AS COUNSEL ON BEHALF OF
HWINI BUTRE MINERALS LIMITED

IN THE PRESENCE OF:

NAME:  Michael Xatse

ADDRESS  REM Law Consultancy, Accra

SIGNED BY
AS COUNSEL ON BEHALF OF
B.D. GOLDFIELDS LIMITED

IN THE PRESENCE OF:

NAME:  James Abiakuba

ADDRESS  P-O Box KIA 9966, Accra

SIGNED BY THE ATTORNEY-GENERAL

IN THE PRESENCE OF:

NAME:  Ama Jantuah Banful.

ADDRESS  Min. of Justice and Attorney General Dept P.C Box M60 Accra

6

SIGNED BY
THE MINISTER RESPONSIBLE FOR MINES )

IN THE PRESENCE OF:

NAME: E-A. AKUFFO

ADDRESS :    CHIEF DIRECTOR
             MINISTRY OF LANDS, FORESTRY & MINES

SIGNED BY
AS COUNSEL ON BEHALF OF
THE MINERALS COMMISSION )

IN THE PRESENCE OF:

NAME: ALBERT ABOH

ADDRESS P. O. Box GP. 294, ACCRA.

SIGNED BY
AS COUNSEL ON BEHALF OF
ST. JUDE RESOURCES LTD

IN THE PRESENCE OF:

NAME: FRANCES KIZZITA MENSAH

ADDRESS P. O. BOX AN 5654, ACCRA

7

# EXHIBIT D

7: 2: 2006.

In the superior Court of Judicature, the Court of Appeal [Civil Division],
Sitting at Accra on Tuesday, the 7th day of February, 2006.

Coram: -  Aryeetey, J.A. [Presiding], Quaye and Anin Yeboah, JJ.A.

H3/574/2005.

HWINI BUTRE MINERALS LTD vrs. THE MINISTER OF
MINES AND ENERGY & 3 ORS.

Mr. James Abiaduka representing the 4th Defendant/Respondent.

M. Innocent Akwayena for plaintiffs/appellants.

Mr. Anthony Desewu for Stanley Amarteifio for 2nd defendant/appellant.

Mr. Okaija Adamafio for 4th defendant.

Mr. Akwayena : - We are happy to announce that the parties have reach
amicable settlement as evidence by the Deed of Settlement dated 31/1/2006
which has been duly executed by all parties in this appeal.  A copy of the Deed of
settlement is attached to the Notice filed on 6: 2" 2006.

We accordingly seek leave of this court for an order giving appeal to the orders
listed in the deed of settlement. We come under Rule 31 of C.I.19 in line with
powers vested in the court.

Mr. Desewu   :-   We adopt the deed of settlement. We agree that the appeal
should be struck out as settled.

Mr. Adamafio : - We entreat the court to give effect to the terms of settlement.

BY COURT : - We make an order giving effect to the terms of settlement
contained in the deed of settlement. The appeals of the Minerals Commission
and Hwini Butre Minerals Ltd. are hereby struck out as settled. The Minister of
Mines is hereby ordered on condition that all requisite statutory conditions are

met, to issue a new prospecting license in respect of the area covered by the prospecting license to St. Jude Resources Ltd. or its nominee.  There will be no order as to costs.

[Sgd]          B. T. ARYEETEY
               JUSTICE OF APPEAL


          "    G. M. QUAYE
               JUSTICE OF APPEAL


          "    ANIN YEBOAH
               JUSTICE OF APPEAL

# EXHIBIT E

**THIS** AGREEMENT is made the 10th day of March 2006
BETWEEN THE GOVERNMENT OF THE REPUBLIC OF GHANA (hereinafter called
"THE GOVERNMENT") acting by **PROF. DOMINIC K. FOBIH**, the Minister of
Lands, Forestry and Mines (hereinafter called "THE MINISTER") of the One Part
and **FIRST CANADIAN GOLDFIELDS LIMITED** having its registered office at
PLOT NO.223, POLICE MOBILE FORCE & RIDGE INT. SCHOOL ROAD, CHAPEL
HILL, TAKORADI, PRIVATE MAIL BAG, TAKORADI, GHANA (hereinafter called
"THE COMPANY") of the Other Part.

**W H E R E A S:**

A.  It is Government's policy to take all such steps as it deems appropriate
and effective for prospecting for minerals in the Republic of Ghana and for
producing gold, diamonds and base metals thereby ensuring that the
maximum possible benefits accrue to the nation from the exploitation of
its mineral resources;

B.  In pursuit of the above policy Government desires to secure the co-
operation of Companies which possess the necessary financial and
managerial qualifications and skills for carrying out mineral operations;

C.  The Company, which warrants its financial, technical and managerial
competence for undertaking mineral operations has declared itself willing
to engage in prospecting operations in Ghana on the understanding that it
shall bear the risk and cost of such prospecting operations and on
establishing that there are good prospects for undertaking commercial
mining operations it may apply for and be granted a mining lease subject
to the provisions of the Minerals and Mining Law, 1986 (PNDCL 153);

**WITNESSESS AS FOLLOWS:**

1.  The Government hereby grants unto the Company the right and licence to
Prospect for and prove gold, diamonds and base metals under or in the
area described in the Schedule hereto and demarcated on the map which
forms part of this AGREEMENT (hereinafter called "the Licence Area")
excluding any parts to be relinquished from time to time for a term of two

(2) years from the ............10th....... day of ...March...., 2006 with a right of extension as hereinafter provided.

2.   RIGHTS OF THE COMPANY:

   a.   The Company shall have the right to conduct such geological and geophysical investigations in the Licensed Area as it considers necessary to determine an adequate quantity of geologically proven and mineable reserve of gold, diamonds and base metals.

   b.   The Company may exercise all or any of the rights and powers granted hereunder through agents, independent contractors or sub-contractors.

   c.   The Company shall not conduct any operations in a sacred area and shall not without the prior consent of the Minister conduct any operations:

      i.   within twenty metres of any building, installations, reservoir, dam, public road, railway or area appropriated for a railway; or

      ii.  in an area occupied by a market, burial ground, cemetery or within a town or village or an area set apart for, used, appropriated or dedicated to a public purpose.

   d.   Nothing contained in this Agreement shall be deemed to permit the Company to dispense with the necessity of applying for and obtaining any permit or authority, which the Company may be required by law or regulation to obtain in respect of any works and/or activities to be carried out hereunder.

3.   RIGHTS OF THIRD PARTIES:

   a.   The Government reserves the right to grant Licences to third parties for prospecting or enter into Agreements for the production of minerals other than gold, diamonds and base metals in the Licensed Area, provided that any such activity shall not

unreasonably interfere with the rights granted to the Company hereunder.

b.   The Company shall not hinder or prevent members of the local population from exercising the following customary rights and privileges in or over the Licensed Area:

   i.    to hunt game
   ii.   to gather firewood for domestic purposes
   iii.  to collect snails
   iv.   to till and cultivate farms
   v.    to observe rites in respect of groves and other areas held to be sacred.

Provided always that where the exercise of these customary rights and privileges unduly interferes with or obstructs the operations of the Company hereunder, the Company shall make arrangements with members of the said local population for the limitation or waiver of such rights and privileges, such arrangements to include the payment of compensation where necessary.  The Government shall furnish such assistance as is reasonably required in the making of such arrangements.

4.   CONDUCT OF OPERATIONS:

a.   The Company shall conduct all of its operations hereunder with due diligence, efficiency and economy to the maximum extent possible consistent with good mining industry practice and in a proper workmanlike manner observing sound technical and engineering principles and practices, using appropriate modern and effective equipment, machinery, materials and methods and to pay particular regard to the protection of the environment.

b.   The Company shall maintain all equipment in good repair and all pits and trenches and all excavated areas in safe and good condition and take all practicable steps:-

    i.  to prevent damage to adjoining farms and villages;

    ii.  to avoid damage to trees, crops, building, structures and other property in the Licensed Area to the extent however, that any such damage is unavoidable the Company shall pay fair and reasonable compensation.

      The Company shall provide and maintain in good repair and condition proper roads, gates, stiles and fences for the convenient occupation of the surface of the Licensed Area.

  c.  The Company shall use its best efforts to exercise its rights and powers granted by this Agreement in such manner as not to cause interference with or avoidable obstruction or interruption to the felling of timber by the licensed timber operators within the Licensed Area and the Government shall furnish assistance to the Company to make appropriate arrangements with such operators to permit the prospecting programme to proceed without interference or delay.

5.  **WORKING OBLIGATIONS:**

  a.  The Company shall with due diligence and by means of modern geological, geophysical and other methods normally associated with mineral prospecting and within three months of the date of this Agreement or at such other time as the Minister may specify, commence prospecting operations with a view to establishing the existence of gold, diamonds and base metals in economic quantities.

  b.  The Company, having prior to the commencement of this Agreement submitted its programme of work to the Government, shall carry out its operations in accordance with the programme and the Chief Executive of the Minerals Commission, Chief Inspector of Mines or any other officer authorized by the

Government shall from time to time inspect the operations to ensure that the Company does so.

c.   The Company shall diligently continue to carry out its operations hereunder and shall spend as actual direct prospecting expenditure not less than the minimum amounts specified in its work programme.

d.   If on the termination or expiration of this Agreement for any reason other than force majeure the Company shall not have spent the amounts specified in the work programme, the difference between the amount actually expended and the stipulated minimum for the year in which termination or expiration takes place shall be paid to the Government within thirty days after the date of such termination or expiration provided that if the termination shall be occasioned by force majeure or upon adequate proof, by the Company that gold, diamonds and base metals mineralization does not exist in sufficient quantities in the area to warrant completion of the work programme, the Company shall not be liable to pay to the Government any difference on the stipulated minimum expenditure.

6.   NOTIFICATION OF DISCOVERY OF OTHER MINERALS:

The Company shall report forthwith to the Minister, the Chief Inspector of Mines, the Director of Ghana Geological Survey and the Chief Executive of the Minerals Commission the discovery in the Licensed Area of any other minerals and the Company shall be given the first option to prospect further and to work the said minerals subject to satisfactory arrangements between the Government and the Company.

7.   SAMPLES:

a.   The Company shall not during the currency of this Agreement destroy, except in analyses, any cores or samples obtained from

the Licensed Area without the prior written consent of the Director of Ghana Geological Survey.

b.    The Company shall provide the Director of Ghana Geological Survey and the Chief Inspector of Mines with such samples from the Licensed Area as they may from time to time reasonably request.

c.    All cores and samples obtained from the Licensed Area shall be delivered to the Director of Ghana Geological Survey on the termination of this Agreement and in the event of the Company not obtaining a mining lease.

8.    RECORDS:

a.    The Company shall maintain at its registered office copies of the following:-

   i.    full and complete records and books of account relating to the prospecting programme.

   ii.    the detailed results and analysis of all surveys, boring, pitting, investigations and other testing conducted pursuant to the provisions of this Agreement.

b.    The records referred to in the foregoing paragraph shall include copies of all geological, geophysical, geochemical, drilling and pitting reports relating to the Licensed Area and all maps, drawings and diagrams pertaining to these reports.

c.    The said records, with the exception of proprietary technical information, shall be made available for inspection at reasonable times without delaying work on the prospecting programme, by the Chief Inspector of Mines and the Chief Executive of the Minerals Commission or their representatives, upon request, and shall be retained in Ghana, unless removed with Government's consent.

d.    Failure to keep such records and to produce them for inspection upon receipt of reasonable notice shall constitute just cause for the cancellation of this Licence.

e.  Copies of the aforementioned records shall be delivered to the Chief Executive of the Minerals Commission and the Chief Inspector of Mines on the termination of this Agreement and in the event of the Company not obtaining a mining lease in respect of the Licensed Area.

9.  REPORTS:

a.  The Company shall furnish to the Chief Inspector of Mines, the Director of Ghana Geological Survey and the Chief Executive of the Minerals Commission, not later than the 15th of each third month, a report giving a general description of the work done by the Company in the preceding quarter and containing a description accompanied by a sketch plan of the areas where gold, diamonds and base metals or any other minerals were found, particulars of the type of minerals found and the number and weight of samples taken, if any.

b.  The Company shall furnish to the Chief Inspector of Mines, Chief Executive of the Minerals Commission and the Director of Ghana Geological Survey not later than sixty days after the end of each calendar year, an Annual Report in such form as may be prescribed.

c.  All records, reports, plans and information which the Company is required to supply to the Government and its agents pursuant to the provisions of this Agreement shall be supplied at the expense of the Company.

d.  Any information or material supplied by the Company to the Government pursuant to the provisions of this Agreement shall be treated by the Government, its officers and agents as confidential and shall not be revealed to third parties except with the consent of the Company (which consent shall not be unreasonably withheld) for a period of 12 months with respect to technical information and

36 months with respect to financial information from the date of submission of such information. The Government and persons authorized by the Government may nevertheless use any such information received from the Company for the purpose of preparing and publishing general reports on minerals in Ghana.

10. FINANCIAL OBLIGATION:

    a.   The Company shall pay to the Government:

        i.   In consideration of the grant of the right of prospecting for gold, diamonds and base metals in the Licensed Area, an amount of US$15,000.00 (fifteen thousand U.S. Dollars) within 30 days from the date of this Agreement;

        ii.   a yearly rent of ¢80,000.00 (eighty thousand cedis)

    b.   Payment of the rent specified in the foregoing paragraph shall be made yearly in advance, the first year's payment having been made before the execution of this Agreement.

11. ASSIGNMENT, MORTGAGE, ETC:

    a.   The Company shall not assign, mortgage, sublet or otherwise transfer any interest in the Licensed Area without the prior written consent of the Government.

    b.   The Government may impose such conditions on the giving of such consent as it thinks fit.

12. SURRENDER OF PART OF LICENSED AREA:

    a.   The Company may surrender at any time and from time to time by giving not less than three months' notice to the Chief Inspector of Mines and the Chief Executive of the Minerals Commission, all its rights hereunder in respect of any part or parts of the Licensed Area. The Company shall be relieved of all obligations in respect of the part or parts of the Licensed Area so surrendered except those obligations, which accrued prior to the effective date of surrender.

b.   The Company shall leave the part of the Licensed Area surrendered and everything thereon in a safe condition. The Company shall take all reasonable measures to restore the surface of such part of the Licensed Area surrendered and all structures thereon not the property of the Company to their original condition. In the event that the Company fails to do so, the Chief Inspector of Mines shall make such part and everything thereon safe and in good condition at the expense of the Company.

13.   RENEWAL OF LICENCE:

a.   If the Company applies in writing to the Government not less than three months before the expiration of this Agreement for a renewal of the licence hereof and if the Company shall not be in default at that time in the performance of any of its obligations hereunder the Company may, subject to the provisions of the law, be granted a period not exceeding two years upon such terms and conditions as the parties may then agree.

b.   A further renewal of the licence may be granted in accordance with the provisions of the Minerals and Mining Law 1986, PNDCL 153.

14.   RE-ENTRY BY GOVERNMENT:

If the operations and activities of the Company in accordance with the prospecting programme shall cease in the Licensed Area before the same have been completed and if such cessation shall be due entirely to the fault of the Company, the Government may, upon giving the notice and following the procedure required in paragraph 15 below, re-enter the Licensed Area and take possession of all buildings, erections, plants and materials thereon without compensation to the Company (such right of entry not to prejudice any additional remedy of the Government), and thereupon the Agreement shall terminate.

15.  **TERMINATION BY THE GOVERNMENT:**

    a.    The Government may, subject to the provisions of this paragraph, terminate this Agreement if any of the following events shall occur:

        i.    the Company shall fail to make any of the payments described in this Agreement on the payment date; or

        ii.    the Company shall contravene or fail to comply with any other condition of this Agreement; or

        iii.    the Company shall become insolvent or commit any act of bankruptcy or enter into any agreement or composition with its creditors or take advantage of any law for the benefit of debtors or go into liquidation, whether compulsory or voluntary, except for the purposes of reconstruction or amalgamation; or

        iv.    the Company knowingly submits any false statement to the Government in connection with this Agreement.

    b.    If and whenever the Government decides to terminate this Agreement pursuant to clauses (i) and (ii) of the preceding sub-paragraph, the Government shall give the Company notice specifying the particular contravention or failure and permit the Company to remedy the same within twenty-one days of such notice or such longer period as the Minister may specify in such notice as reasonable in the circumstances.

    c.    If the Company shall fail to remedy an event specified in clauses (i) and (ii) of sub-paragraph (a) of this paragraph within the stated period, or an event specified in clauses (iii) and (iv) of the said sub-paragraph shall occur, the Government may by notice to the Company terminate this Agreement.

    d.    Upon termination of this Agreement by the Government every right of the Company hereunder shall cease (save as specifically otherwise provided hereunder) but subject nevertheless and

without prejudice to any obligation or liability imposed or incurred under this Agreement or applicable law prior to the effective date of termination.

e.  No delay or omission or course of dealing by the Government shall impair any of its rights hereunder or be construed to be a waiver of an event specified in sub-paragraph (a) of this paragraph or acquiescence therein.

16.  ASSETS ON TERMINATION OR EXPIRATION:

Upon the termination or expiration of this Agreement, the Company may within sixty days from the effective date of such termination, remove from the Licensed Area any structures and installations erected and any movables placed thereon by the Company.  Any structures, installations and movables not so removed within the said period shall become the property of the Government without charge.

17.  FORCE MAJEURE:

a.  Failure on the part of the Company to comply with any of the terms and conditions hereof (except the obligations to make payment of monies to the Government) shall not be grounds for cancellation or give the Government any claim for damages in so far as such failure arises from force majeure, the Company having taken all appropriate precautions, due care and reasonable alternative measures with the objective of avoiding such failure and of carrying out its obligations hereunder.   The Company shall take all reasonable measures to remove such inability to fulfil the obligations hereunder with the minimum of delay.

b.  For purposes of this paragraph force majeure includes acts of God, war, insurrection, earthquake, storm, flood or other adverse weather condition but shall not include any event caused by the failure to observe good mining industry practice or by the negligence of the Company or any of its employees or contractors.

c.   The Company shall notify the Minister within twenty-four hours of an event of force majeure affecting its ability to fulfil the terms and conditions hereof.

d.   The period of this Agreement shall be extended for a period of time equal to the period or periods during which the company was affected by any of the conditions set forth in sub-paragraph (b) of this paragraph, but not to exceed six months in the aggregate.

18.   FOREIGN EXCHANGE:

a.   Subject to sub-paragraph (b) of this paragraph the Company shall, during the term of this Agreement and so long as it does not derive any revenue from its operations hereunder, finance such operations in the following manner:

    i.   by converting to Ghana currency through authorized dealers such amounts of foreign currency as will be sufficient to cover the Company's operating expenses required to be paid in Ghana currency including any payments to the Government and third parties provided that the terms of any loans obtained abroad shall be in conformity with currency international commercial and monetary conditions and that prior notice of such loans and advances shall be furnished to the Bank of Ghana.

    ii.   By directly purchasing and/or hiring abroad as is necessary for conducting the prospecting programme with its foreign currency funds and importing to and/or using in Ghana freely and without restrictions such machinery, equipment, materials and services of any nature whatsoever as will be required by the Company for its operations hereunder.

b.   The Company may be required to pay all its rentals and other licensing fees to the Government in dollars or other freely

convertible currency, or such currencies as shall be specified by the Bank of Ghana.

c.    All conversions of currency shall be made at the prevailing official rates of exchange.

19.    PRODUCTION AGREEMENT:

If upon the expiration of this Agreement the Company shall have carried out its obligations hereunder to the satisfaction of the Government and shall have successfully established to the Government that the development of a mine from ore reserves established within the Licensed Area is economically and financially feasible, then the Government shall grant to the Company the first option to (i) acquire a lease for the purposes of mining in the Licensed Area, and (ii) participate in a mining project in the Licensed Area subject to negotiation with the Government of satisfactory terms for such licence and participation

20.    NOTICE:

Any application, notice, consent, approval, direction, or instruction hereunder shall be in writing and shall be served by hand or by registered mail. Delivery by hand shall be deemed to be effective when made, and delivery by registered mail shall be deemed to be effective at such time as it would in the ordinary course of registered mail be delivered to the addressee. Until changed by appropriate notice, the Company's address in Ghana is its registered office as set forth above and the addresses of the Government officials are as follows:

i.    The Hon. Minister, Ministry of Lands, Forestry & Mines, P.O. Box M.212, Accra.

ii.    The Chief Inspector of Mines, Mines Department, P.O. Box 3634, Accra

iii.    The Director, Ghana Geological Survey, P.O. Box M.80, Accra

iv.    The Chief Executive, Minerals Commission, P.O. Box M.248, Accra

v.    The Director, Survey Department, P.O. Box 191, Accra

vi.    The Governor, Bank of Ghana, P.O. Box 2674, Accra

21.    ARBITRATION:

Subject to the provisions hereof, if any time during the continuance of this Agreement or after its termination any question or dispute shall arise regarding the rights, powers, duties and liabilities of the parties hereto such question or dispute shall be referred to arbitration in accordance with the Arbitration Act 1961 (Act 38). In such event, there shall be two arbitrators, one to be appointed by each party.

22.    GOVERNING LAW:

This Agreement shall be governed by, construed and interpreted in accordance with the laws of Ghana.

23.    HEADINGS:

The headings given to paragraphs in this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement.

## THE SCHEDULE ABOVE REFERRED TO:

All that piece or parcel of land containing an approximate area of 40.00 square kilometres lying to the North of Latitudes 4°56'04", 4°56'05", 4°56'37", 4°57'09", 4°57'10", 5°03'07" and 5°06'34"; South of Latitudes 4°59'52", 5°05'00" and 5°06'45"; East of Longitudes 1°52'43", 1°52'55", 1°53'31" and 1°53'32"; West of Longitudes 1°50'24", 1°52'02", 1°52'34", and 1°53'07" in the Mpohor Wassa East District of the Western Region of the Republic of Ghana which piece or parcel of land is more particularly delineated on the plan annexed hereto for the purposes of identification and not of limitation.

IN WITNESS WHEREOF the parties hereto have executed this Agreement the day and year first above written.

SIGNED AND SEALED with the SEAL ]
of the Ministry of Lands, Forestry and ]
Mines and DELIVERED by the said ]
**PROF. DOMINIC K. FOBIH** ]
Minister for Lands, Forestry and Mines ]
for and on behalf of the Government of ]
the Republic of Ghana in the presence: ]

MIN. OF LANDS, FORESTRY & MINES

E ASARE ANIM JR.
CHIEF DIRECTOR
MINISTRY OF LANDS, FORESTRY & MINES

The COMMON SEAL/STAMP of the said ]
**FIRST CANADIAN GOLDFIELDS** ]
**LIMITED** ]
was affixed to these presents and the ]
same were DELIVERED in the ]
presence of: ]

LEO EDUAMAH
DIRECTOR/SECRETARY

Robert Griffis
MANAGING DIRECTOR

## OATH OF PROOF

I ....*E. Asare Ahin*.... of Minerals Commission MAKE OATH and SAY

that on the ............. day of ................................. 2006 I was present and saw

**PROF. DOMINIC K. FOBIH**, the Minister of Lands, Forestry and Mines duly

execute the Instrument now produced to me and Marked "A" and that the said

**PROF. DOMINIC K. FOBIH** can read and write,

Sworn at Accra this ....*10th*.......... day of .......*Marh*............... 2006

Before Me

...................................... ......................................
REGISTRAR OF LANDS                        DEPONENT
REGISTRAR
HIGH COURT
ACCRA

This is the Instrument Marked "A" Referred to in the Oath of...*E. Asare Ahin*

SWORN before me this ....*10*............ day of ....*Marh*............ 2006

..................................
REGISTRAR OF LANDS
REGISTRAR
HIGH COURT
ACCRA

On the...*10*...day of....*Mard*............2006 at ...*1:10*... O'clock in the ........... noon

this Instrument was proved before me by the Oath of the within-named

*E. Asare Ahin*........to have been duly executed by the within-named

**PROF. DOMINIC K. FOBIH**.

..................................
REGISTRAR OF LANDS
REGISTRAR
HIGH COURT
ACCRA

Dated this ........ 10th ........ day of ........ March ........ 2006



GOVERNMENT OF THE REPUBLIC OF GHANA

IN ACCORDANCE WITH SECTION 12 OF THE STAMP
ACT 1965 I CERTIFY THAT IN MY OPINION THIS
INSTRUMENT IS CHARGEABLE WITH DUTY OF

FIRST CANADIAN GOLDFIELDS LIMITED



# PROSPECTING LICENCE

SOLICITOR OF THE
SUPREME COURT

TERM:                   TWO (2) YEARS (RENEWABLE)
COMMENCEMENT:  10 - 3 - 2006
EXPIRY DATE:        9 - 3 - 2008
FILE NO.:               PL.2/47

## 1.    General Information

First Canadian Goldfields Ltd is a subsidiary of St. Jude Resources, a Canadian Junior exploration group; the parent company is located in Delta British Columbia; tel. number 1-604-940-6565, fax 940-6565) and the Ghana subsidiary currently has an office at Plot. 223 North Chapel Hill in Takoradi, Western Region (telephone 031-25771; fax 25773; email stjude@idngh.com).

In late 2006, an agreement was finalized whereby Golden Star Resources of Denver Colorado agreed to purchase all of the shares of St Jude Resources through an exchange of shares. Thus, Golden Star will become the underlying owner of St Jude Resources. However, St Jude will continue to exist as a private company and will continue its activities in Ghana and other parts of West Africa. As the result of a major financing in 2003, in which St Jude raised about 13 million USD, the company is in a strong financial position and able to carry forward with its exploration plans in the Mpohor and Benso areas of the Western Region.

St. Jude has been active in Ghana since the mid 1990s; most of the company's activities have been focused on the Dabokrom (Mpohor) and Benso concessions, immediately to the NW of Takoradi. This project is at the feasibility stage and a report is currently being prepared to plan an integrated mining project with the neighbouring Benso prospecting concession, which is also owned and operated by St Jude. To date, about 14 million USD has been spent on the Dabokrom concession and 6 million USD has been spent on the adjacent Benso concession. This work has established significant resources that will very likely support a profitable gold mining operation.

The Dabokrom concession covers approx. 40 km$^2$ and it lies mainly within the headwaters of the Hwini and Butre drainage basins. The current application is in fact a re-instatement of a previous concession that was reduced to the current size. This re-instatement came about as the result of protracted legal problems between the original partners of the concession. These problems were recently resolved in court by a ruling that the property should be put into the name of St Jude or its nominee (First Canadian Goldfields).

Access to the area is quite good. A major gravel road passes alond the entire western margin of the concession from Mpohor northwards through Edum Banso and the BOPP (Unilever) oil palm plantation to the town of Benso on the Takoradi-Tarkwa railway line. Over the years, St Jude has established dirt roads in many parts of the concession as the result of the need to do drilling at numerous prospect areas, especially in the southern and northern parts of the concession. A major powerline crosses just to the north of the concession, close to the town of Benso, and a 2nd major powerline crosses the concession immediately to the south of Mpohor.

The topography of the area can be fairly rugged in many areas where the relief is as much as 100m but most is less than 50m between elevation of 30-80m ASL in most of the main river valleys and 90-180m ASL on the tops of hills. Most of the hills are rounded ridges but there are a few prominent, flat-topped but steep-sided hills capped with iron-rich laterite, which marks an old peneplain surface.

2

*FIRST CANADIAN GOLDFIELDS LIMITED*

The climate and vegetation is quite typical of SW Ghana. The main rainy season usually falls in the period Mar-June and a 2nd usually occurs in the months of Sept-Oct; the total annual rainfall is usually in the range of 1500-2000mm. The high rainfall and humidity during much of the year produces lush tropical vegetation but primary semi-deciduous forests are found only in the Subri River forest reserve, which lies to the north of the area. Through out much of the area, there are fairly extensive areas of secondary forests on hill slopes and widespread bamboo clusters in the valleys. The day-time highs and night-time lows are usually in the range 22-35°C, with the coolest periods being in Dec-Feb when dry Harmattan winds blow southwards from the Sahara.

The area is dotted with small subsistence farm plots managed by local villagers throughout the area; the main crops are palm oil, cassava, yams, plantation, corn, okro, bananas, coconuts, and pineapple. At the southern end of the concession, there is a large oil palm plantation owned and operated by Norpalm, a Norwegian company, and just to the north of Edum Banso, and immediately to the west of the concession, the Unilever group operates another very large oil palm (BOPP) plantation. These and several other smaller oil palm plantations are the main employers in this district. There is very limited other industry in the area and most of the population is engaged in farming although at times, small-scale gold mining along some river channels (at Mpohor) is quite active.

The proximity to the major Port of Takoradi and access to the national power grid are a major boost for any mining activity in the area and the northern part of the concession is also very close to the Tarkwa mining district. In terms of available infrastructure, this concession is probably the best placed in the country.

## 2. Geology

The Dabokrom license covers a long (about 20 km north-south), narrow area, pretty well centered on longitude 1° 52'30"W and located at the southern part of the prolific gold producing Ashanti Belt of SW Ghana. The area is dominated by narrow bands of Birimian 'greenstone' separated by extensive intermediate, belt-type granitoid complexes.

The Birimian 'greenstones' are Paleoproterozoic in age (approx. 2000-2200My) and consist of interbedded mafic lavas, tuffs, volcaniclastics and minor chemical sediments. Within the lease area, the 'greenstones' feature a narrow band of lavas in the south (towards Butre on the coast); this band widens considerably to the north around Manso where extensive sequences of interbedded lavas and metasediments are located.

These metavolcanic sequences have been intruded by the classical Dixcove-type of intermediate (granodiorite to tonalite) intrusives, which are now often refered to as belt-type intrusives. These intrusions are largely coeval with Birimian volcanism and sedimentation; they are typically concordant and often display a prominent metamorphic foliation. Some phases of the belt intrusions are quite felsic, approaching true granites.

The area also includes numerous mafic intusions; the most conspicuous in this area being the large donut-shaped Mpohor diorite complex, which lies at the southern end of the Dabokrom concession and which is host to important gold mineralization. There appear to be many other similar but much smaller mafic plutons scattered throughout the band of metavolcanics. These intrusives appear to post-date the belt-type granitoids; they also

3

intrude both the Birimian and younger Tarkwaian sediments and they pre-date the Eburnean 'thermotectonic'event (approx.1900-2000My). The observed metamorphic mineral assemblages are mainly greenschist phase but there is evidence to suggest that amphibolite grade metamorphism may have been widespread in the area.

The Tarkwaian continental and shallow marine clastic units, which are very widespread just to the north of the proposed concession, probably covered much of this area as well but have been largely stripped away. Some minor slivers and lenses of these metasediments are preserved along the coast and there are likely to be a few similar occurrences, possibly within the concession area.

There are also some minor but interesting diabase dikes that cut through and along the concession area. These are mainly Mesozoic (Jurassic??) intrusions that are easily traced along north trending fractures from the coast inland for hundreds of kilometers. They are likely the result of the break away of the African and South American continents and birth of the Atlantic Ocean. Two of these dikes are located just to the east of the Dabokrom concession.

This entire region is sliced up by a great variety of fault and fracture systems. Many of the fault systems appear to parallel the approx. NNE regional metamorphic fabric of the country rock but there are also important discordant structural features, some of which are N-S, E-W, N-W and NE trending. Some of these structural features appear to play a seminal role in localizing gold mineralization, which is quite widespread throughout the area.

## 3.    Gold Potential and Past Work

The gold potential of the licence area is very considerable and substantial resources have been outlined on the concession and additional work will almost certainly extend the known resources and discover new ones. This includes the cluster of major occurrences (Adoikrom, Father Brown, Dabokrom) just south of Mpohor and the numerous prospects (Abada, Guadium, Apatunso etc) at the north end of the Dabokrom concession. The adjacent Benso concession has two major gold occurrences close to the village of Subriso and numerous other prospects in the immediate vicinity.

Independent consultants have outlined substantial resources in the southern cluster of prospects; this includes close to 700,000 ozs of measured and indicated resources (about 6 million tonnes @ about 3.5 g/t) at Adoikrom, Father Brown and Dabokrom. These are mainly 'sulphide' resources but about 10-15 % is classified as oxides. The mineralization is free-milling and a substantial amount of the gold can be recovered by physical means.

All of these gold prospects appear to be largely controlled by regional structures. This includes a prominent NNE to N-S trending feature that host prospects in the southern part of the Dabokrom concession as well as those at the north end. This structure may extend to the vicinity of Subriso East on the adjacent Benso concession and it may also extend northwards to Chichiwelli and the Kubekrom/ Wassa mine at Akyempim. Along these north trending regional structures, cross-cutting faults may play an important role at providing an improved channel system for mineralized hydrothermal fluids and thereby forming possible economic concentrations of gold.

4

There has been considerable past artisanal mining in the license area and, in fact, the Dabokron area is mentioned in early historical accounts as a source for gold being traded at Elmina with the early Portugese sailors that first arrived in the region in the late 15th century. At the beginning of the last century, and again in the 1930s, this area attracted considerable exploration attention by numerous junior European mining groups.

Since the late 1980s, there has been considerable exploration work after the concession was acquired by a local company (BD Goldfields), who first brought in a Danish group to carry out preliminary exploration. In the early 1990s, Placer-Outokumpu optioned the property and did some wide-spaced drilling to test the Dabokrom area for large–scale mining targets. However, their results were disappointing and they dropped the option. Shortly thereafter, another Scandinavian group carried out some surface exploration and then in late 1994, St Jude optioned the property. St Jude has managed the exploration work since then but as a result of legal problems, there was about a 4-year hiatus on work from 2001 to 2004.

The St Jude work has been fairly comprehensive and systematic; it has included extensive and detailed soil geochemistry, airborne geophysics, ground geophysics, trenching, pitting and drilling. There have been about 300 drill holes (mostly diamond drilling) totaling about 20,000m; most of these were at Adoikrom, Father Brown and Dabokrom but many other targets have been tested and numerous other targets remain to be further tested. At present, St Jude and Golden Star are completing an in-house feasibility study to assess the possibility of treating the relatively high-grade gold resources on the Dabokrom concession at the Wassa plant.

## 4. Work Programme, Schedule and Estimated Costs

There remains much exploration work to be done whilst the feasibility study proceeds. The exploration work will focus on expanding and better defining some of the existing resources in the southern cluster of prospects (Adoikrom, Father Brown, Dabokrom). Each of these prospects remains open at depth where narrow but high-grade intersections confirm deep mining potential. In addition, there are numerous areas nearby to these prospects where the soil geochemistry indicates potential for similar mineralization at very shallow depth. These target areas will be further defined, prioritized and drilled systematically.

The initial prioritizing of existing geochem targets will involve hand auger sampling at 3-5m depths in order to avoid the wide dispersion of gold very close to surface, which is a very common feature of this area. This will be followed up by RAB drilling to shallow depths (20–40m) across target areas in order to identify the best prospects, which will then be followed by diamond and/or RC drilling.

At he north end of the concession there are also several significant prospects such as Abada, Guadium, Apatunso and Breminsu, which warrant further attention. All these prospects have strong, complex gold-in-soil anomalies that extend well beyond the known occurrences. There has been limited drilling in this area; it has been partially successful but results show an erratic distribution of gold at many localities. However, in some areas, the mineralization is quite high-grade (i.e., Guadium and Apatunso) and the potential for at least small but good quality resources is very encouraging.

5

*FIRST CANADIAN GOLDFIELDS LIMITED*

A similar follow-up plan to that described above will be followed. This will again include shallow hand auger drilling on existing gold-in-soil geochem anomalies in order to better locate the buried targets. The priority targets will then be tested with RAB drilling followed by diamond drilling where definite bedrock targets have been substantiated.

While the general exploration programme is underway, the feasibility studies will continue on the plan to combine the gold resources with the adjacent Benso concession and to truck and/or rail the mineable reserves to the Wassa plant at Akyempim. Already much of the environmental and metallurgical studies for this work have been completed and a considerable amount of mine planning has been undertaken as well. However, more is planned over the next few months with the expectation that a provisional mine development plan will be completed in the 2nd or 3rd quarters of 2006.

The following is the proposed budget for the above work programme; this covers only the work planned in the first year. The programme for the 2nd year will depend very much on results but it is anticipated that overall costs will be similar as it is expected that a lot more drilling will be justified in order to further expand the resource base.

**The costs for proposed programme for Year 1 are as follows:**

|  | USD |
|---|---|
| **Auger Sampling** (includes analyses) – 2000 samples @ 8 USD each | 16,000 |
| **RAB Drilling** (includes analyses) – 20,000m @ 6 USD/m | 120,000 |
| **Diamond/RC Drilling** (includes analyses) – 6000m @ 80 USD/m | 480,000 |
| **Environmental Studies** (continuation of past work) | 30,000 |
| **Metallurgical Testwork** (continuation of past work) | 50,000 |
| **Engineering and Feasibility Studies** | 60,000 |
| **Management and Overheads** | 100,000 |
| **Contingency** | 54,000 |
| **TOTAL** | **900,000** |

6

## 5.  Environmental Considerations

First Canadian/ St Jude will continue to adopt a responsible and respectful attitude towards the environment and will liase carefully with the EPA on all environmental matters. There is currently a **valid EPA permit** covering the exploration activities until **Feb 2007.** EPA personnel have visited the field site as part of the evaluation of the exploration work and as a preliminary visit with respect to a future possible mine plan for the Dabokrom and Benso concessions.

For the proposed work programme, the auger drilling leaves a minimal environmental footprint as it involves a small crew taking a few samples at shallow depth from a hole that is only a few centimeters in diameter. On the other hand, the RAB, diamond or RC drilling will have a more lasting impact but this will be minimized by careful selection of mostly existing access roads and drill sites that will be selected so as to have the least effect on farms and infrastructure. Any drilling will involve a fair crop compensation scheme for local farmers whose crops may be damaged by our field activities. We will bring EPA personnel to work sites to inspect and guide our efforts to minimize environmental damage. Recently we have met with local farmers and revised our compensation rates to reflect inflation costs in the local economy.

St. Jude has a responsible attitude towards environmental and safety issues; we insist that work sites are not littered and that personal safety practices (seat belts, hard hats on construction sites, safety boots etc) are carefully followed. Since St Jude is now part of the larger Golden Star group, we will be able to benefit from more specialized environmental and safety expertise now available within the group.

*FIRST CANADIAN GOLDFIELDS LIMITED*

# Dabokrom Prospecting Programme

## Year 1  Schedule of Work

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Auger Drilling | | | | | | | | | | | | |
| RAB Drilling | | | | | | | | | | | | |
| Diamond and/or RC Drilling | | | | | | | | | | | | |
| Environmental Studies | | | | | | | | | | | | |
| Metallurgical Studies | | | | | | | | | | | | |
| Engineering and Feasibility Studies | | | | | | | | | | | | |

FIRST CANADIAN GOLD FIELDS LIMITED.
FEBRUARY, 2008

# GOLD CONCESSION FOR FIRST CANADIAN GOLDFIELDS LTD.
## SITUATED AT MPOHOR W/R. AREA APPROX. 40.0 SQ. KMS.



### PILLAR CO-ORDINATES

| Pillars | Long | Lats |
|---|---|---|
| p1 | 1° 50' 24"W | 5° 06' 45"N |
| p2 | 1° 50' 24"W | 5° 06' 34"N |
| p3 | 1° 52' 02"W | 5° 06' 34"N |
| p4 | 1° 52' 02"W | 4° 57' 10"N |
| p5 | 1° 52' 34"W | 4° 57' 09"N |
| p6 | 1° 52' 34"W | 4° 56' 37"N |
| p7 | 1° 53' 07"W | 4° 56' 37"N |
| p8 | 1° 53' 06"W | 4° 56' 04"N |
| p9 | 1° 53' 31"W | 4° 56' 05"N |
| p10 | 1° 53' 31"W | 4° 59' 52"N |
| p11 | 1° 52' 43"W | 4° 59' 52"N |
| p12 | 1° 52' 43"W | 5° 03' 07"N |
| p13 | 1° 53' 32"W | 5° 03' 07"N |
| p14 | 1° 53' 32"W | 5° 05' 00"N |
| p15 | 1° 52' 55"W | 5° 05' 00"N |
| p16 | 1° 52' 55"W | 5° 06' 45"N |

Scale 1:100,000

PARTS MAP SHEET: 0402A AND 0502C    FEB. 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| B. D. GOLDFIELDS, LTD., | ) | |
| a Ghanaian Corporation, | ) | |
| Ex Rel Derivative Action, by | ) | |
| Shareholder Paul Oteng, and B. D. | ) | |
| GOLDFIELDS, LTD., | ) | |
| a Ghanaian corporation | ) | Civil Action No. 1:08-CV-00916-ESH |
| | ) | |
| Plaintiff, | ) | The Honorable Ellen Segal Huvelle |
| | ) | |
| v. | ) | |
| | ) | |
| GOLDEN STAR RESOURCES LTD., | ) | |
| a Canadian corporation, and | ) | |
| ST. JUDE RESOURCES LTD., | ) | |
| a Canadian corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**[PROPOSED] ORDER**

Now before the Court is the Motion to Dismiss filed by defendants Golden Star

Resources Ltd., and St. Jude Mineral Resources Ltd.  Having considered the Motion, any

opposition thereto, and any reply, the Court finds the Motion should be granted.

It is therefore ORDERED that the Motion to Dismiss is GRANTED; and

It is further ORDERED that this civil action is hereby dismissed for lack of subject

matter jurisdiction and for lack of personal jurisdiction.

Is it so ORDERED.

_____
The Honorable Ellen S. Huvelle, USDJ

Copies to:

Stephen J. Jorden, Esq.
Brian P. Perryman, Esq.
JORDEN BURT LLP
Jefferson Square, Suite 400 East
1025 Thomas Jefferson Street, NW
Washington, DC 20007-5208
Local Counsel for Defendants

Tom McNamara, Esq.
Thomas P. Johnson, Esq.
Jonathon D. Bergman, Esq.
Rudy E. Verner, Esq.
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Lead Counsel for Defendants

John S. Lopatto III, Esq.
1776 K Street, NW, Suite 200
Washington, DC 20006
Counsel for Plaintiff